Burke, J.
 

 Appellant (Dell Publishing Company, Inc.), the publisher of a magazine entitled “ Modern Romances ”, on this appeal seeks to reinstate an injunction which was set aside by the Appellate Division in an action to restrain respondent (Stanley Publications, Inc.) from using the word “ modern ” in respondent’s magazine title qqNFE^SIONS >> (hereinafter designated “ Modern/CoNFESsiONS ”), alleging trade-mark infringement and unfair competition. We find that the denial of the injunction and the dismissal of the complaint was proper.
 

 Appellant has since 1930 published monthly both ‘
 
 ‘
 
 Modern Romances ” and “ Modern Screen ”. These two, along with a third magazine, currently “ Screen Stories ”, have been previously offered as a unit to advertisers as the “Modern Magazines ” and later as the Dell Modern Group. The third magazine has never had the word “ modern ” in its title. For the past 15 years the combined circulation of these three magazines has been approximately two and one-half million copies a month. ‘1 Modern Romances ’ ’ alone has exceeded one million copies a month, and its advertising revenue exceeds $800,000 annually.
 

 “Modern Romances” was originally registered as a trade' mark in the United States Patent Office in 1932, and re-registered in 1954 under the Trade-Mark Act (Lanham Act) of 1946 (U. S. Code, tit. 15, § 1051
 
 et seq.).
 

 
 *130
 
 In addition to the above three magazines appellant publishes approximately 18 distinct magazines, 38 comics and 14 pocket-size books a month, as well as 20 children’s books each year. With only one or two exceptions each of the covers carries 1 ‘ in the upper left-hand corner the distinctive and conspicuously placed
 
 ‘
 
 dell ’ insignia or symbol, consisting of the letters dell in a contrastingly colored box ”. This symbol was first adopted in 1943 and has since been used continuously in its advertising and letterheads, as well as on its publications, in order to identify them as appellant’s property.
 

 Over a period of 21 years since 1937 Dell spent approximately $2,320,000 to advertise and promote the Dell Modern Group, of which $1,140,000 was expended on
 
 £1
 
 Modern Romances ’ ’ alone. In promoting “ Modern Romances ” individually and as a member of the Dell Modern Group, Dell employed radio, television, newspapers, magazines and direct mail advertising. In 1948 a program entitled £ £ Modern Romances ’ ’ was initiated on radio, and later put on television.
 

 Respondent, on the other hand, has since 1952 published various magazines including “Real Secrets ”, “Real War ” and “ Real Men”. Early in 1958 respondent’s executives decided to publish a companion magazine to Real Secrets, and initially selected the title “ Real Confessions ” in order to keep it in the Real Group. However, upon being informed that this title had been previously adopted by another publisher, the title “ Modern/CoNEESSiONS ” was chosen. It is conceded that “ [o]ne or more of the persons at defendant’s editorial conference were aware of plaintiff’s Modern Romances ’ ’. However, it is claimed
 
 that11
 
 none saw any possible conflict, since historically the magazine field has had £ close ’ titles; that is competing titles containing one or more identical or nearly identical words in a composite title. For instance, £ Adventures for Men ’ and 1 Real Adventures ’ are published by competing publishers, as are
 
 ‘
 
 Movie Life ’ and
 
 ‘
 
 Movie Mirror ’; ' Confidential ’ and £ Confidential Detective ’; £ Man’s Conquest ’ and ' Man’s Smashing Stories ’; and £ Police Dragnet ’ and £ Police Gazette, ’ all of which are distributed by the
 
 same national
 
 distributor.”
 

 Although additionally conceding that “ Modern/Confessions ” is generally classified in the same field (i.e., romance-confession) as “Modern Romances ”, respondent notes that
 
 *131
 
 the U. S. Patent Office records include approximately 61 publications whose registered titles contain the word 6 modern ’ including" Modern Teen ”,££ Modern Bride ”, Modern Miss 5
 
 ‘ ‘
 
 Modern Photography ”,
 
 “
 
 Modern Baby ’5 and £ £ Modem Man ”,
 
 none of which are published by the appellant or respondent.
 
 Moreover, additional evidence of identical common words in competing magazines in the romance-confession field was thus indicated: “ True Story ”, ££ True Romance ”, ££ True Love ” and ££ True Experience ” published respectively since 1919,1923, 1924 and 1925 by Macfadden Publications, Inc.; £ 6 True Confessions ” published since 1922 by Fawcett Publications; £< True Secrets ” published by Official Magazine O’orp.; ££ Real Romances ” and ££ Real Story ” published by Hillman; £< Real Confessions ’ ’ published by Sterling.
 

 Out of 26 magazine titles in the romance-confession field, 11 use the word “ romance ”, 5 use “ confessions ”, 5 use ££ story ” and 6 use ££ experience ”.
 

 In choosing the word ££ modern” respondent’s officers testified that they wanted a descriptive word which would also distinguish this magazine from the multitude of
 
 confession
 
 magazines.
 

 The majority of the Justices of the Appellate Division found undisputed £ £ that all so-called £ romanee ’ and
 
 ‘
 
 confession ’ magazines, which cater primarily to the distaff side, share common characteristics. Most contain in their title a word such as
 
 ‘
 
 romance ’,
 
 ‘
 
 confession £ secrets ’ or £ experience. ’ The stories — which purport to be true — are actually fictional, are told in the first person, and deal with lurid accounts of sins, aberrations, mistakes, illicit loves, and marital infidelities. The covers of such magazines almost invariably feature the photographs or portraits of young and pretty girls as well as £ blurb ’ lines headlining the stories inside.” On the other hand, the Appellate Division quite accurately noted that££ Primarily, the logotype of £ Modern Confessions ’ in no way resembles that of
 
 1
 
 Modern Romances. ’ Even a cursory examination of the exhibits shows that the two words of plaintiff’s title are printed on the cover of plaintiff’s magazine in letters of equal size, and on a single line. The words in defendant’s title, however, are in italics, and the emphasis is on the word ' confessions.’ £ Modern ’ is in the lower case type, and is located
 
 above
 
 the word £ Confessions’—which extends entirely across the cover.
 

 
 *132
 
 “ Moreover, plaintiff’s magazine has the name dell printed in the upper left-hand corner. Another aspect of difference is the nature of the banner headlines on the respective magazines for the past five months. It is apparent that plaintiff in the form of its cover is seeking to broaden its reader base by appealing not just to the ‘ confession ’ market, but to the general women’s magazine market with such titles as: ‘ Complete in this Issue: Chicken Cook Book ’;
 
 ‘
 
 There is a Perfect Hairdo For you on page 97 ’;
 
 ‘
 
 Save $20 on 20 Dinners etc. On the other hand, defendant’s magazine makes no pretense at merchandising anything but so-called ‘ confessions ’; with the upper headlines of its last five issues blazoning such titles as:
 
 ‘
 
 Invitations to Sex? ’; ‘ Why Shouldn’t He Wait For Me
 
 ‘
 
 Teen Girl on Sin Street ’; and ‘ Afraid to Trust My Heart. ’
 

 “Hence one need only pick up copies of the plaintiff’s and defendant’s magazines to see that their covers, their contents and even the texture of their paper are significantly different. The similarities are only those inherent in the nature of the product.”
 

 Prior to the trial of this action six issues of respondent’s magazine were published with an average net paid circulation of 130,000 copies per month, and net advertising revenue of $1,000 for each issue. “ Modern/Confessions ” has a sales price of 25 cents as distinguished from the price of 20 cents for “ Modern Romances ”.
 

 The Appellate Division, finding for the respondent, ordered a reversal of findings of fact contained in the decision and opinion of the Supreme Court. In their view the evidence “ does not warrant a finding of a reasonable tendency to cause confusion ”. Defendant’s magazine, they said, is clearly “distinguishable from plaintiff’s, and cannot reasonably be mistaken for it.” They found in addition that although the decision of the Supreme Court rested on a finding of unfair competition, and not on trademark infringement, it is apparent that a likelihood of confusion would be relevant to both claims; that “ [a]s already indicated, the record does not support a conclusion of a reasonable likelihood of confusion and that
 
 the word “ modern
 
 ”, as used in magazines in the romance-confession field, “
 
 is not a nondescriptive term which had acquired a secondary meaning to be protected by a court of
 
 equity.”
 

 
 *133
 
 The weight of the evidence supports the prevailing opinion of the Appellate Division.
 

 It is fundamental that the substantive law of trade-marks is merely a portion of the broader law of unfair competition
 
 (Hemmeter Cigar Co.
 
 v.
 
 Congress Cigar Co.,
 
 118 F. 2d 64); and that it is intended to discourage and restrain one from palming off his goods and/or their origin as the goods of another
 
 (Triangle Pub.
 
 v.
 
 Hanson,
 
 65 F. Supp. 952, affd. 163 F. 2d 74). While we undoubtedly have jurisdiction over actions involving unfair competition, it is equally fundamental that, although Federal law may govern an action for infringement of a Federally registered trade-mark, we share jurisdiction over such actions with the Federal courts
 
 (Brown & Bigelow
 
 v.
 
 Remembrance Adv. Prods.,
 
 279 App. Div. 410, affd. 304 N. Y. 909).
 

 However, it has been noted that even a casual examination of the decisions will indicate that, aside from the broad and well-established principles, not only is precedent difficult to ascertain, but in many instances the decisions seem incompatible
 
 (Telechron, Inc.,
 
 v.
 
 Telicon Corp.,
 
 97 F. Supp. 131, affd. 198 F. 2d 903). Although this type of litigation has been said to present mixed questions of law and fact
 
 (Palmer
 
 v.
 
 Gulf Pub. Co.,
 
 79 F. Supp. 731;
 
 Fawcett Pub.
 
 v.
 
 Popular Mechanics Co.,
 
 80 F. 2d 194), the emphasis, and rightfully so, we believe, seems to have been placed upon the fact pattern of each situation.
 
 (Telechron, Inc.,
 
 v.
 
 Telicon Corp., supra;
 
 see, also,
 
 Hotel Syracuse
 
 v.
 
 Motel Syracuse,
 
 309 N. Y. 831;
 
 Eastern Constr. Co.
 
 v.
 
 Eastern Eng. Co.,
 
 246 N. Y. 459.) Each case, whether dealing with unfair competition or trade-mark infringement or both, must be decided on its facts, and “ the reported cases are helpful to show the general principles to be applied in reaching a decision ”
 
 (Palmer
 
 v.
 
 Gulf Pub. Co., supra,
 
 p. 737).
 

 We proceed, therefore, to these general principles and their application in this particular situation.
 

 The Lanham Act (U. S. Code, tit. 15, §§ 1051-1127) provides that: “A certificate of registration * * * shall be prima facie evidence of the validity of the registration, registrant’s ownership of the mark, and of registrant’s exclusive right to use the mark in commerce in connection with the goods or services specified in the certificate” (§ 1057, subd. [b]). However,
 
 *134
 

 “
 
 ‘ the mere registration of a trade-mark does not in itself confer any greater rights than existed at common law without registration. ’ # ** * ‘ registration * * * confers only procedural advantages and does not enlarge the registrant’s substantive rights. ’ ”
 
 (Brown & Bigelow
 
 v.
 
 B B Pen Co.,
 
 191 F. 2d 939,
 
 942.)
 
 Registration of a descriptive word does not prevent others from using the same word, or from registering a new mark which uses it, if the new mark has additional features
 
 (Pure Oil Co.
 
 v.
 
 The Pep Boys—Manny, Moe & Jack,
 
 128 F. 2d 34).
 
 The test, as in unfair competition, is the likelihood of confusion, regardless of evidence of actual confusion. (Famous Sea Food House
 
 v.
 
 Skouras,
 
 272 App. Div. 258;
 
 T. A. Vulcan
 
 v.
 
 Myers,
 
 139 N. Y. 364, 367;
 
 Admiral Corp.
 
 v.
 
 Penco, Inc.,
 
 203 F. 2d 517, 520).
 
 [1]
 
 Therefore, if the resemblance is calculated to produce confusion as to identity and consequent damage, equity will enjoin the simulation
 
 (American Foundries
 
 v.
 
 Robertson,
 
 269 U. S. 372;
 
 Eastern Constr. Co.
 
 v.
 
 Eastern Eng. Co.,
 
 246
 
 N.
 
 Y. 459,
 
 supra).
 
 It is well established, however, that not all similarity will be enjoined. The law does not justify interference on behalf of ignorant or careless persons
 
 (Corning Glass Works
 
 v.
 
 Corning Cut Glass Co.,
 
 197 N. Y. 173;
 
 Buffalo Typewriter Exch.
 
 v.
 
 McGarl,
 
 240 N. Y. 113;
 
 Wholesale Serv. Supply Corp.
 
 v.
 
 Wholesale Bldg. Materials Corp., 304 N.
 
 Y. 854;
 
 Hotel Syracuse
 
 v.
 
 Motel Syracuse, supra).
 
 It must be assumed that the public will use reasonable intelligence and discrimination
 
 (Wholesale Serv. Supply Corp.
 
 v.
 
 Wholesale Bldg. Materials Corp., supra).
 
 “A court of equity should proceed in the exercise of its power with a wise and judicial discretion. In cases such as this it should be presumed that the public makes use of the senses of sight and hearing, and that it is possessed of a sufficient amount of intelligence to note the difference the senses convey. The court ought not to interfere with the freedom of conduct of trade and with general business competition. Its power to restrain should be reserved to prevent fraud and imposture from some real resemblance in the name and
 
 *135
 
 appearance of the publications.”
 
 (Munro
 
 v.
 
 Tousey,
 
 129 N. Y. 38, 43.)
 

 In our opinion neither the name, sound nor appearance of respondent’s title or magazine is significantly similar so as to cause persons of average intelligence to be confused either as to their origin or identity. As the Appellate Division stated: “ Even a cursory examination ” reveals their distinction. “ The similarities are only those inherent in the nature of the product ”, and their duplication is not a proper subject of restraint. It is not all competition,
 
 but only unfair competition,
 
 which equity should enjoin
 
 (Fawcett Pub.
 
 v.
 
 Popular Mechanics Co.,
 
 80 F. 2d 194, 197,
 
 supra).
 
 Registration of “Modern Romances ” affords appellant no additional privileges upon this record.
 

 Although the Lanham Act “ put federal trade-mark law upon a new footing ”
 
 (Johnson & Son
 
 v.
 
 Johnson,
 
 175 F. 2d 176, 178, cert. denied 338 U. S. 860), the mere registration of descriptive or suggestive words would not automatically preclude their use by others when the evidence indicates a lack of secondary meaning. Unlike registration under the prior law, which limited validity to names which could meet the requirements of a technical trade-mark (i.e., an arbitrary or fanciful term having no meaning in relation to the goods in question), the Lanham Act now authorizes those common and generic terms which through continuous use have become identified with the origin of the goods.
 
 (Brown
 
 &
 
 Bigelow
 
 v.
 
 Remembrance Adv. Prods.,
 
 279 App. Div. 410, affd. 304 N. Y. 909,
 
 supra.)
 
 Although subdivision (e) of section 2 of the Lanham Act (U. S. Code, tit. 15, § 1052, subd. [e]) provides that the Patent Office shall refuse registration of a mark which is
 
 11
 
 merely descriptive ’ ’, it further provides that nothing shall prevent the registration of a mark which has “ become distinctive of the applicant’s goods ” (U. S. Code, tit. 15, § 1052, subd. [f]), or as it is commonly phrased — which has acquired a secondary meaning.
 

 Note, however, that while registration is prima facie evidence of validity (U. S. Code, tit. 15, § 1057, subd. [b]), the mark is still open to objection, as descriptive, until the provisions (which concededly have not been complied with) of section 15 (U. S. Code, tit. 15, § 1065; especially subd. [2]) have been met.
 
 (Conde Nast Pub.
 
 v.
 
 Vogue School of Fashion Modelling,
 
 105
 
 *136
 
 F. Supp. 325.) Moreover, even if they had been complied with it would not preclude an objection here since the marks are not identical. The protection of the incontestability clause of the Lanham Act must be with regard to the use by another of
 
 both terms,
 
 unless one, in and of itself, is naturally identified with the registrant. This would not apply to the word 1 ‘ modern ’ ’ alone. Appellant’s magazine is “ known and called for by its full name ”
 
 (Collegiate World Pub. Co.
 
 v.
 
 Du Pont Pub. Co.,
 
 14 F. 2d 158, 160). The word “ modern ” would not in and of itself in view of the numerous publications employing it (see
 
 McGraw-Hill Pub. Co.
 
 v.
 
 American Aviation Assn.,
 
 117 F. 2d 293, 296) be distinctive of appellant alone. It certainly is not a coined term, and it is not used in a
 
 completely arbitrary
 
 manner. While possibly
 
 not wholly descriptive,
 
 it certainly is at least suggestive
 
 [2]
 
 of the contents.
 

 Although, as suggestive, it may still be a valid trade-mark, it does not here qualify since it has not become identified, in the minds of the public, with the origin of the goods
 
 (Telechron, Inc.,
 
 v.
 
 Telicon Corp.,
 
 97 F. Supp. 131,
 
 supra).
 
 It is not without significance that there are 61 registered publications employing this term in their titles. No one seeking Dell’s “.Modern Romances ” could reasonably be expected to get it by requesting and calling it by the single word “ modern ”. “
 
 [B]oth words of the title are of equal dignity and importance and they always have been used together without distinguishing
 
 emphasis.'’’
 
 (Fawcett Pub.
 
 v.
 
 Popular Mechanics Co.,
 
 80 F. 2d 194, 198, supra; publisher of “ Popular Mechanics ” denied injunction to restrain use of word “ mechanics ” in title “ Modern Mechanics ”).
 

 While “confessions” and “ romances ” convey much the same meaning, “ this is necessarily so because both are descrip
 
 *137
 
 tive of the articles to which they are applied.”
 
 (Collegiate World Pub. Co.
 
 v.
 
 Du Pont Pub. Co., supra,
 
 p. 160; title “ College Humor ” and “ College Comics ” not sufficiently similar to warrant relief.) Both their sound and appearance are certainly distinct and their use with the common word “ modern ” does not drastically alter that distinction. Moreover, the manner in which they are employed amplifies the distinction. (See
 
 Crowell Pub. Co.
 
 v.
 
 Italian Monthly Co.,
 
 28 F. 2d 613, 614;
 
 Time, Inc.,
 
 v.
 
 Motor Pub.,
 
 131 F. Supp. 846, 850, mod. 227 F. 2d 954.)
 

 In addition, the reading public of this class of magazine is more concerned with the intrinsic character of the magazines as exemplified by the “blurb” lines on their face (see
 
 Gotham Music Serv.
 
 v.
 
 Denton & Haskins Music Pub. Co.,
 
 259 N. Y. 86) than with the publisher
 
 (Pocket Books
 
 v.
 
 Meyers,
 
 292 N. Y. 58, 63). In order to establish a trade-mark it must be shown that “
 
 the primary significance of the term in the minds of the consuming public is not the product but the producer.” (Kellogg Co.
 
 v.
 
 National Biscuit Co.,
 
 305 U. S. 111, 118, 119; italics supplied;
 
 Brown & Bigelow
 
 v.
 
 Remembrance Adv. Prods.,
 
 279 App. Div. 410, 413, affd. 304 N. Y. 909,
 
 supra.)
 
 Here if the public is interested in a Dell romance story, it will certainly have no difficulty in identifying the Dell symbol in the upper left-hand corner of the magazine cover. (See
 
 Pocket Books
 
 v.
 
 Meyers, supra.)
 

 The publishing field, as any other business, is within the ambit of judicial protection
 
 (Munro
 
 v.
 
 Tousey,
 
 129 N. Y. 38, 41,
 
 supra).
 
 However, it is recognized that ‘ ‘ the names of periodicals present problems not as common where other commercial goods or other intellectual property is concerned.” (2 Mms, Unfair Competition and Trade-Marks [4th ed.], § 279, p. 928.) These names seldom are arbitrary or wholly fanciful and “ [e]ven those that are technical, common law trade-marks often are more or less suggestive.” (2 Nims, Unfair Competition and Trade-Marks [4th ed.], § 279, p. 930.) This problem is compounded, and secondary meaning is difficult to establish, because of the repetitious use of similar titles by competing publishers. For example, in the
 
 Collegiate World
 
 case (14 F. 2d 158, 160,
 
 supra),
 
 in denying an injunction against the use of a similar descriptive title (i.e., “ College Humor ” — “ College Comics ”), the court noted that: ‘ ‘ Similarity in names of magazines dealing with the same
 
 *138
 
 subject is not unusual, but on the contrary is quite common, such as Popular Science, Popular Mechanics; Outdoor Life, Outdoor Recreation; Field and Stream, Forest and Stream; Boy’s Life, Boy’s Magazine; Ladies Home Journal, People’s Home Journal; Radio Doings, Radio Digest, Radio World, Radio Age, Radio Progress, Radio News, Radio Broadcast; Motor, The Motor, Motor Transport, Motor Record, Motor World, Motor Age, Motor Life; etc.” (See, also,
 
 Warner Pub.
 
 v.
 
 Popular Pub.,
 
 87 F. 2d 913, 914 [“ Ranch Romances ”, “ Rangeland Romances ”];
 
 McGraw-Hill Pub. Co.
 
 v.
 
 American Aviation Assn.,
 
 117 F. 2d 293, 296, supra;
 
 Palmer
 
 v.
 
 Gulf Pub. Co.,
 
 79 F. Supp. 731,
 
 supra.)
 

 Appellant’s final claim that respondent deliberately imitated appellant’s mark is an inference deduced merely from testimony by respondent’s executives that they were aware of the success and reputation of “ Modern Romances ”. Even if the allegation is accurate, it is nonetheless apparent that the final product is not so simulative of appellant’s magazine as to warrant relief by this court.
 

 Accordingly, the judgment should be affirmed, with costs.
 

 Chief Judge Desmond and Judges Dye, Fttld, Froessel, Van Voorhis and Foster concur.
 

 Judgment affirmed.
 

 [1]
 

 . The Federal statute defines trade-mark infringement as the use of "Any * * * colorable imitation of any registered mark in connection with * * * any goods or services on or in connection with which such use is likely
 
 to cause confusion or mistake or to deceive purchasers as to the source of origin of such goods or services"
 
 (U. S. Code, tit. 15, § 1114, subd. [1]; emphasis supplied).
 

 [2]
 

 . “ Between the two extremes represented by the arbitrary or fanciful name, on the one hand which may be a trade-mark, and the word or phrase which is primarily descriptive of the article * * * ‘lies a middle ground wherein terms of mingled qualities are found. It cannot be said that they are primarily descriptive or that they are purely arbitrary or fanciful without any indication of the nature of the goods which they denominate. Such terms, indeed, shed some light upon the characteristics of the goods, but so applied they involve an element of incongruity, and in order to be understood as descriptive, they must be taken in a
 
 suggestive
 
 or figurative sense through an effort of the imagination
 
 on
 
 the
 
 part of
 
 the observer.’ ” (1 Rims, Unfair Competition and Trade-Marks [4th ed.], § 41, p. 168; emphasis supplied.)