**THOMSON INDUSTRIES, INC., Plaintiff,**
v.
**NIPPON THOMPSON CO., Ltd. and H. Teramachi, Defendants.**

No. 63–C–1311.

United States District Court
E. D. New York.

Nov. 14, 1968.

---

Morgan, Finnegan, Durham & Pine, New York City, for plaintiff Hobart N. Durham, New York City, of counsel.

Hopgood & Calimafde, New York City, for defendant, John M. Calimafde, New York City, of counsel.

Memorandum of Decision and Order

MISHLER, District Judge.

The complaint recites one claim for patent infringement and a second claim for trademark infringement and unfair competition. The answer denies the material allegations of the complaint and affirmatively prays for a judgment declaring the patent in suit to be invalid. The action was tried to the court without a jury.

### Background

The plaintiff in this action is Thomson Industries, Inc., a corporation organized under the laws of the State of New York. John Thomson is the president and sole stockholder of the corporation. Plaintiff began doing business under its present name in 1944. Prior to that time, it was known as Zimmer-Thomson, Inc. Until about 1945, it was engaged in the manufacture of medical equipment and aircraft propellers. Since then, it has been involved in the production of drilling heads and bearings, including linear motion bearings. Linear motion bearings are designed to support relatively frictionless linear travel along a shaft and are used in machines, products, and tools where a reciprocating movement is required.

Plaintiff corporation has enjoyed considerable commercial success. Its business has increased steadily and since about 1958, it has had gross sales in excess of $1,000,000 per year, of which approximately 65% to 75% is attributable to the sale of linear motion bearings. For the past 21 years, plaintiff has associated the name "Thomson" with its bearings and has stamped or etched the name wherever practical on the bearings. Moreover, it has spent well in excess of $100,000 per year for the past 10 years advertising the "Thomson" bearing to the trade. About 60% of this figure has been devoted to linear motion bearings. All "Thomson" bearings are packed in distinctive cartons carrying the "Thomson" name and registered mark. The trademark consists of the individual letters of the name "Thomson" with each letter set in a contrasting circle as follows:

**THOMSON**

An application for registration of the mark was made by plaintiff on March 2, 1964, subsequent to the commencement of this action. The mark was registered on the principal register in the office of the U. S. Patent Office on May 18, 1965.

Plaintiff's first excursion into the linear motion bearing field came in 1945 when it began manufacturing such bearings under a Ferger patent. The Ferger bearing was produced through the use of expensive machine tooling and was not suitable for commercial exploitation.

Plaintiff, therefore, sought a cheaper method of manufacturing a linear bearing. In furtherance of this endeavor, patents were filed by Thomson[1] and by Robert C. Magee,[2] currently the vice-president of Thomson Industries. Both men envisaged the use of punch-pressing or metal-deforming as a replacement for the costlier machining techniques. The Magee patent is the patent in suit. Plaintiff has manufactured bearings under it since the filing of the patent application in 1947. It has granted licenses under the patent to a German and an English factory.

The defendants in this action are the Nippon Thompson Co., Ltd. (hereinafter Nippon), a Japanese corporation, and Hiroshi Teramachi, the president of the corporation. Nippon began doing business under that name in 1963, shortly before the commencement of the action. Before that, it was known as Daiichi Kogyo Co., Ltd., and acted as distributor for the Nippon Thompson Bearing Co., also a Japanese company. Nippon continued in this capacity until it acquired the Nippon Thompson Bearing Co. early in 1964. Prior to the merger, defendant Teramachi was both the principal stockholder of Nippon and a stockholder of the Nippon Thompson Bearing Co.

In the fall of 1963, before the official consummation of the merger, Teramachi came to the United States to establish outlets for his bearing business. He brought with him about twenty copies of a catalogue issued in Japan by Nippon Thompson Bearing Co., Ltd., which prominently displayed the names "Thompson" and "Iko-Thompson" and samples of needle and linear motion bearings. One type of linear motion bearing had indentations on the outer sleeve; the other had a smooth surface. The indented bearing, trademarked "Ease", was of Japanese manufacture unrelated to the Nippon Thompson Bearing Co. Teramachi submitted a sample of the "Ease" bearing to Microtol Industries, one of defendant's distributors, in 1963. No other distributions or sales of the "Ease" bearings were ever made by the defendants in the United States. The smooth-surfaced bearing was manufactured by the Nippon Thompson Bearing Co. Defendant corporation has continued to sell this type of bearing in the United States.

Nippon enjoys a world-wide market with respect to the various types of bearings which it manufactures. It sold approximately $30,000 worth of bearings in the United States last year; of that sum, only about $3,000 was attributable to linear motion bearings.

Prior to the institution of this action, defendant corporation etched the name "Thompson" on its bearings. Since then, however, it has identified the bearings by marking both the trade name "Iko" and their country of origin, Japan, on them. The cartons in which the individual bearings are packed are orange and black and have the trade name "Iko" as well as the name of the manufacturer and place of manufacture clearly indicated on them.[3] In addition, the stock number placed on each carton has the prefix "LMB", indicating linear motion bearing. The catalogues listing defendant's bearings are similarly identified. The plaintiff's bearings are advertised and sold with the "Thomson" trademark in individual cartons colored in yellow and brown. Plaintiff describes his bearings in advertising and packaging as "ball bushings."

1. U.S. Pat. #2,503,009—application filed June 7, 1946—letters issued April 4, 1950; U.S. Pat. #2,509,749—application filed June 7, 1946—letters issued May 30, 1950.

2. U.S. Pat. #2,628,135—application filed March 15, 1949—letters issued Feb. 10, 1963 (continuation, in part, of application serial no. 744,314 filed April 28, 1947).

3. They bear the legend: "Nippon Thompson Co., Ltd. Made in Japan."

## The Patent

The subject matter of the patent in suit is a bearing designed for relatively frictionless linear motion along a shaft. It has four essential elements:

1. An outer sleeve having indentations at spaced intervals about the periphery of its external surface and corresponding raised portions on its internal surface, which raised portions serve as working tracks for balls under load as shown in paragraph 2;

2. An inner or ball-retaining sleeve in which longitudinally extending oval tracks have been formed which tracks extend substantially the length of the sleeve. Each track is slotted along half its length in such a way that the slots register with the raised portions on the outer sleeve. The balls filling the slotted halves of the tracks have bearing contact with the shaft. The other half of each track is recessed so that the balls filling that half may move freely out of contact with the shaft;

3. Balls substantially filling the tracks;

4. End rings pressed radially against the ends of the inner sleeve to maintain the relative position of the inner sleeve to the outer sleeve.

## The Patent Office Procedure

Robert C. Magee filed an application for letters patent on an invention he described as "Anti-Friction Bearing for Linear Motion and Method of Manufacturing the Same" on April 28, 1947 (Serial No. 744,314). The specification conceded that " * * * the operative principle of the bearing is not new * * * " but indicated that " * * * the earlier structural designs embodying this principle have been too difficult and expensive to manufacture for commercial production. * * * " The specification continued:

"In the design here presented where a series of individual ball-circuits are spaced at regular intervals around the shaft, the entire structure consists essentially of a one-piece pressure-deformed outer sleeve, a one-piece press-formed inner sleeve, two end rings securing the outer and inner sleeves together, and the necessary balls to fill the circuits. A primary object of the invention has been so to design the bearing that substantially all of the forming operations can be done in a punch-press, thereby eliminating expensive machining and tedious hand-fitting work heretofore necessary."

The patent examiner directed division of the claims into article and method claims. Pursuant to the direction, Magee cancelled the article claims and continued to prosecute the method claims. This effort, however, initially met with failure. The examiner observed with respect to these method claims that, "A process is not patentable merely because it is applied to a different article." (Paper No. 7) The applicant, therefore, added claims 31 and 32, which covered a method of applying pressure to the external surface of the metal tubing to form indentations and raised portions on its internal surface. He argued that because of the need for precise alignment between the working tracks and the balls under load, this claim presented an obvious advance in the art. In the meantime, the Board of Patent Appeals held that French patent No. 755,957 (dated September 18, 1933) did not bar Ferger (Ex parte Hulbert K. Ferger, Appeal No. 22081, decided October 30, 1950) from a patent claim where Ferger's claim resulted "in great advantages to the manufacture of the [linear motion] bearing and this is obvious especially in view of the accuracy necessary in making the grooves for ball bearings." Magee urged the examiner to regard this decision as strong authority for the allowance of his claims. Apparently persuaded by the reference to Ferger, the examiner held claims 31 and 32 " * * * allowable as at present advised." (Paper No. 13, August 25, 1952) The application, however, was abandoned.

On March 15, 1949, Magee filed a second application. Incorporated into this application, which was made as a continuation in part of his first application,

were the previously cancelled article claims. Claims 1, 2, 8, 15 and 16 of this application, as amended, became claims 1, 2, 7, 15 and 12 of the patent in suit. It is important to note, however, that as with the method claims, the examiner approved these claims only after the decision of the Board of Appeals in Ferger was brought to his attention.

Claims 1 and 2 [4] disclose the inner and outer sleeve formations. Claim 7 [5] discloses both the raised portions on the internal surface of the outer sleeve without reference to indentations and the end ring assembly designed to hold the parts of the bearing together and prevent rotation of the sleeves relative to each other. Claims 12 and 15 [6] disclose split and open linear motion bearings.

### Prior Art—Claims 1 and 2

The traditional analysis of the scope of the disclosures made by the prior art must, in this case, await resolution of a dispute concerning the makeup of that prior art. The parties concede the predecessor status of the French and Ferger patents. The plaintiff, however, is unwilling to accord such a position to Thomson patents numbers 2,503,009 (herein-

4. Claim 1:
   1. An anti-friction bearing for combination with a shaft to provide for relative linear movement between the bearing and shaft and having a plurality of longitudinally extending oval-shape raceways, balls substantially filling said raceways and each of which is sometimes under load and sometimes a free ball, a sleeve, and a retainer within the sleeve in which said raceways are formed and which is slotted to permit the balls under load to have direct bearing contact with both the sleeve and the shaft, and characterized by this: that the external surface of the sleeve has indentations at spaced intervals about its periphery and corresponding raised portions on its internal surface, said raised portions constituting working tracks for the balls under load and registering respectively with the slots in the retainer.
   Claim 2:
   2. The bearing defined in claim 1 further characterized by this: that the said working tracks are formed on the respective inner extremities of the raised portions of the inner surface of the sleeve, and that the ends of said raised portions recede gradually from said tracks to and blend into the original contour of the interior surface of the sleeve.

5. Claim 7:
   7. A ball-bearing for combination with a shaft to provide for relative linear movement between the bearing and shaft and comprising an outer sleeve having at spaced intervals about its periphery raised portions on its internal surface providing along their inner extremities working tracks for the balls under load, an inner sleeve in which a plurality of longitudinally extending oval-shaped raceways are formed each of which has a cut-out portion to provide a slot and these slots registering respectively with said working tracks of the outer sleeve, balls substantially filling said raceways, and rings extending into and pressing radially against the ends of the inner sleeve whereby the latter is held in a viselike grip by the rings and the ends of the outer sleeve.

6. Claim 12:
   12. An anti-friction bearing for combination with a shaft to provide for relative linear movement between the bearing and shaft and having a plurality of longitudinally extending oval-shaped raceways, balls substantially filling said raceways, the balls in one of the straight portions of the raceways being in bearing contact with the shaft while the balls in the other straight portion and the connecting curved portions are in clearance and characterized by this: that the bearing is split longitudinally and that means are provided to adjust its bore diameter by varying the distance between the oppositely facing edges produced by the split.
   Claim 15:
   15. An anti-friction bearing for combination with a shaft to provide for relative linear movement between the bearing and shaft and having a plurality of longitudinally extending oval-shaped raceways, balls substantially filling said raceways, the balls in one of the straight portions of the raceways being in bearing contact with the shaft while the balls in the other straight portion and the connecting curved portions are in clearance, and characterized by this: that the bearing has a longitudinal opening extending from one end to the other whereby the shaft may be supported along its length without inhibiting relative movement between the shaft and the bearing.

after referred to as "009") and 2,509,749 (hereinafter referred to as "749") both of which were applied for prior to the patent in suit.[7] These patents disclose both a punch-pressed outer sleeve and a punch-pressed inner sleeve and, therefore, would, if included in the prior art, cast substantial doubt upon the validity of the Magee patent. Plaintiff has urged this court to resist such a conclusion in favor of its assertion that these features of the Thomson patent originated with the Magee invention.

The thrust of this argument is a challenge to the validity of the Thomson patents. Essential to the success of this challenge is the ability of plaintiff to prove two factual propositions. First, it is necessary for plaintiff corporation to establish a date of invention by Magee which predates the filing of his application for patent. And, second, plaintiff must prove that the date so established is prior to the invention dates of the Thomson patents. *See* 35 U.S.C. § 103.

■ Efforts to secure recognition of a pre-filing date of invention have been looked upon with considerable skepticism by the courts in this circuit. *See, e. g.,* Rooted Hair, Inc. v. Ideal Toy Corp., 329 F.2d 761 (2d Cir.), cert. denied, 379 U.S. 831, 85 S.Ct. 63, 13 L.Ed.2d 40 (1964); Ritter v. Rohm & Haas Co., 271 F.Supp. 313 (S.D.N.Y.1967). Parties who have attempted to sustain such a proposition therefore have been called upon to satisfy a heavy burden of proof. As the Court of Appeals said in United Shoe Machinery Corp. v. Brooklyn Wood Heel Corp., 77 F.2d 263, 264 (2d Cir. 1935):

"When an inventor's date is to be carried back beyond the date of his application, courts regard the effort with great jealousy, and must be persuaded with a certainty which is seldom demanded elsewhere; quite as absolute

as in a criminal case, in practice perhaps even more so. * * * "

Despite this severe burden, plaintiff has made a showing sufficient to justify a finding that the Magee invention was conceived on March 1, 1946, approximately one year prior to the date on which Magee's original patent application was filed. Plaintiff's offer of proof on this issue consisted of the testimony of Magee and Thomson coupled with a sketch of the Magee invention bearing the March 1, 1946 date. The sketch was of central importance. Without it, the testimony of Magee and Thomson would have been uncorroborated and, although uncontradicted on this point, would probably not have sufficed. See Rooted Hair, Inc. v. Ideal Toy Corp., *supra.*

■■ Plaintiff has, however, failed in its effort to establish that the inventions claimed in the Thomson patents were conceived subsequent to this March 1, 1946 date. On this issue, it needed only to satisfy the normal civil burden of a preponderance of the evidence.[8] Plaintiff, however, offered only the testimony of Thomson and Magee. This testimony is, in the opinion of this court, entitled to little weight. These two men, as officers of plaintiff corporation, had more than a mild interest in the resolution of this issue. Moreover, their testimony at trial was in direct conflict with the positions taken by them in their respective applications for patents at a time significantly more proximate to the events in question. In his application for the patents now under attack by plaintiff, Thomson assured the Patent Office that he was the original inventor of the articles described, and Magee expressed silent agreement with that assurance by failing to assert his priority of invention when claims in his application were rejected as unpatentable over one of the Thomson

---

7. See notes 1 and 2 *supra.*

8. Plaintiff has the burden of persuasion on this issue by virtue of the presumption of validity which attaches to every patent. 35 U.S.C. § 282. This presumption, how-

ever, is not strong enough to impose a burden as heavy as that facing plaintiff on the issue of a pre-filing date of invention. Lorenz v. F. W. Woolworth Co., 305 F.2d 102 (2d Cir. 1962).

patents. These two men have by their own testimony indicated that they worked together for a considerable period of time on the problem of designing a bearing which could be inexpensively produced. In view of both this and the passage of twenty years since the conception of all of the three inventions, it is unlikely that either Thomson or Magee has a clear recollection of which invention was conceived first.

There is an additional reason for rejecting plaintiff's argument concerning the priority of the Magee invention. Plaintiff corporation has been the owner of Thomson patents 009 and 749 for some eighteen years and has never before disavowed them on the grounds of the priority of the Magee invention. It was, moreover, John B. Thomson, president and sole stockholder of plaintiff corporation, who, under oath, assured the Patent Office that he was the inventor of the articles claimed in those patents. It would be inequitable to allow plaintiff to change its position at this late date in order to impose yet another monopoly on the bearing industry. *See*, Greenwood v. Bracher, 1 F. 856, 858 (Cir.Ct.D.N.J. 1880); United States Hoffman Machinery Corp. v. Richa, 78 F.Supp. 969, 973 (W.D.Mo.1948), *appeal dismissed by stipulation*, 174 F.2d 1023 (8th Cir. 1949). This court, therefore, holds that Thomson patents numbers 009 and 749 are part of the prior art in this case.

The relationship between the prior art and claims 1 and 2 of the Magee patent may now be considered. The operative principle and component parts of the bearing in suit were fully disclosed by the French patent. But, as the plaintiff correctly pointed out, none of the bearings revealed by the prior art, the French patent included, were both operationally sound and susceptible to inexpensive production. The advance which Magee claims to have secured in claims 1 and 2 lies in the combining of these attributes by so designing the inner and outer sleeves of the bearing that substantially all of the forming operations could be performed in a punch press.

Although the record in this case strongly supports the proposition that the Magee bearing was, in fact, the first to combine both operational and commercial success, it is clear that Magee cannot claim responsibility for having introduced the technique of punch pressing into the linear motion bearing art. The Thomson patents discussed earlier taught the application of this technique in the formation of both the inner and outer sleeves of such bearings. Thomson's use of the punch press, however, cannot in any fair sense be considered to have identically disclosed the invention claimed by the Magee patent. See 35 U.S.C. § 102. The crucial question, therefore, is whether Magee's contribution to the art is such that his invention as a whole would have been obvious to a person of ordinary skill in that art. 35 U.S.C. § 103.

*Validity—Claims 1 and 2*

The issue of the validity of claims 1 and 2 of the patent in suit is a two-faceted one. Of crucial importance is the usual question of whether the subject matter of the claims constituted a non-obvious advance over the prior art. If this question is resolved against the patent, further consideration of the issue of validity will, of course, be unnecessary. A determination in favor of the patent, however, will not have a similar result. Remaining will be the far more troublesome question of whether the patentee has adequately claimed whatever patentable advance is properly attributable to his invention.

As indicated earlier, the subject matter of claims 1 and 2 consists of the structural design of the inner and outer sleeves of the bearing. The inner sleeve or ball-race member would seem to have been fully anticipated by the prior art. Both Thomson patent 009 and Thomson patent 749 disclose ball-race members formed by punch pressing. The ball-race member in Thomson 009, in particular, closely resembles the one described in claim 1 of the Magee patent. The principal difference between the two lies in Thomson's use of this member as

an outer sleeve rather than as an inner sleeve. The conversion of the member into an inner sleeve would have been obvious to a person having ordinary skill in the art.

The innovation in outer sleeve design claimed by the patent in suit stands on a different footing. In the first place, it is clear that this improvement in bearing technology has no precursor in the prior art patents cited by defendant. The punch-pressed outer sleeve disclosed by Thomson patent 009 does not even remotely resemble it. In contrast with the ball-race outer sleeve described by the Thomson patent, the Magee patent envisages the use of a punch press or other metal-deforming process to indent the outer sleeve at spaced intervals and thus form corresponding raised portions on the inner surface, which raised portions serve as working tracks for the balls under load. What Magee did, in effect, was to develop an economical method for forming the raised working tracks characteristic of the bearings disclosed in the French and Ferger patents. The raised portions on the outer sleeves disclosed by those patents could be produced only through the use of intricate and expensive machining techniques. Needless to say, therefore, the finished product was unsuited to commercial production. The machining process, however, had its advantages. It made possible the attainment of the extremely close tolerances necessary for the smooth functioning of the bearing, tolerances which could not be achieved through the more economical punch-press technique introduced by Thomson. Magee's innovation made possible the combination of the best features of these prior art patents because the raised portions formed by his method of indenting the outer sleeve could be machined at relatively low cost to the tolerances essential for operational success.

Defendant is accurate in its assertion that punch pressing is old in the metal forming art. It is with a recognition of both this and the fact that Magee cannot claim credit for introducing punch pressing into the bearing field itself that this court holds his improvement to have been a patentable advance. The invention lies not in the use of punch pressing as such, but rather in Magee's unique use of that technique.

The preceding discussion has focused solely on the question of whether the Magee invention has made a nonobvious contribution to the linear motion bearing art. The existence of a nonobvious advance, however, is not by itself sufficient to sustain the validity of a patent purporting to embody that advance. A finding of validity is additionally dependent upon a determination that the claims in question in fact describe the patentable advance.

Claims 1 and 2 are fatally deficient in this respect. Described in them is a bearing having certain structural characteristics, the most important of which is an outer sleeve with indentations on its outer surface and corresponding raised portions on its inner surface which serve as working tracks for the balls under load. The patentable invention contributed by Magee, the method of forming these indentations and corresponding raised portions, is mentioned only in the specifications.

The claims in question then are for an article of manufacture. As such, they will be sustained only if the bearing disclosed is itself a new and useful article. Reference to the specifications in an effort to construe the claims as limited to the product of a patentable process will in no way obviate the necessity for such a finding. Cochrane v. Badische Anilin and Soda Fabrik, 111 U.S. 293, 4 S.Ct. 455, 28 L.Ed. 433 (1884); Application of Smith, 162 F.2d 466, 34 CCPA 1202 (1947); Pfanstiehl Chemical Co. v. American Platinum Works, 135 F.2d 171 (3d Cir. 1943). The process cannot impart invention to an otherwise unpatentable article. *Pfanstiehl, supra;* Musher Foundation, Inc. v. Alba Trading Co., 150 F.2d 885 (2d Cir.), *cert. denied*, 326 U.S. 770, 66 S.Ct. 175, 90 L.Ed. 465 (1945), one of the few Second Circuit authorities on the subject, is not to the contrary. In

the portion of that decision which is relevant to the question now confronting this court, the Court of Appeals held only that definiteness may be imparted to a product claim by reference to that part of the specification which describes the process for making it. But there is a suggestion in the brief dictum which concludes the opinion that the article disclosed need not itself be a nonobvious advance over the prior art in order to be validly claimed as the product of a patentable process. A reading of this dictum together with the cases cited by the court, however, produces a different interpretation. *See* especially General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 374, 58 S.Ct. 899, 904, 82 L.Ed. 1402 (1938). Rather than departing from a widely followed rule, the court was merely raising the now familiar question of whether a patent describing a product by reference to the process of making it can cover any product other than that made by the process. Musher Foundation, Inc v. Alba Trading Co., supra 150 F.2d at 889. As the court indicates, the problem is created by the fact that such a description discloses only the process and leaves the public in the dark concerning the structural nature of the product itself. The patentability of the product under discussion in *Musher* was conceded by the defendant in that case. The bearing described in claims 1 and 2 is not a patentable article of manufacture. The structural characteristics which distinguish it from prior art conceptions are merely reflective of the innovation in manufacturing technique disclosed in the specifications and have no substantial impact on its operation or operative principle.

■ Thus far, no attention has been given to the presumption of validity which attaches to every patent by virtue of 35 U.S.C. § 282. This presumption derives from the expertise of the patent office, Lorenz v. F. W. Woolworth Co., 305 F.2d 102 (2d Cir. 1962) and is consequently entitled to little weight where, as in this case, the patent was granted on the basis of an erroneous understanding of the applicable law. The file wrapper history of the patent in suit indicates that Magee encountered substantial difficulty in attempting to persuade the Patent Examiner of the patentability of claims 1 and 2 over the French patent. The examiner abandoned his objection to these claims only after Magee directed his attention to a decision by the Board of Patent Appeals which approved the Ferger application over the same French patent on the ground that the bearing disclosed by Ferger was substantially cheaper to produce. Magee urged the examiner to regard this decision as mandating the allowance of claims 1 and 2. Although the examiner did not expressly adopt this argument, it is fair to infer from the circumstances just now alluded to that it was, in fact, the basis of his decision.

■ Neither the propriety of the Board's decision in Ferger nor the accuracy of the characterization of that decision urged upon the examiner by Magee are in issue in this case. The court is interested only in the examiner's conception of the consequences of that decision for the Magee patent. That this conception was in conflict with the applicable law has already been made clear. The savings in production cost associated with the Magee bearing are attributable to an innovation in the method of manufacture. For an article to be patentable it must itself embody invention and not merely be the product of a patentable process.

Claims 1 and 2 are invalid.

*Prior Art—Claim 7*

The French patent does not expressly disclose raised portions on the internal surface of the outer sleeve which function as working tracks for the balls under load. Rather than the creation of raised portions, the French patent envisages the formation of recessed portions on the outer sleeve to provide tracks for the free balls. The Ferger patent, however, does disclose such raised portions.

The end rings referred to in claim 7 were not disclosed by any of the prior art patents cited by defendant.

## Validity—Claim 7

█ The working tracks formed by the raised portions of the internal surface of the outer sleeve were disclosed by the prior art. The absence of any reference in claim 7 to indentations in the outer surface of the sleeve eliminates the very arguments for invention made for claims 1 and 2. The pressing of the end rings radially does not reach the level of invention. It would have been obvious to a person with ordinary skill in the art. Claim 7 is, therefore, invalid.

## Prior Art—Claims 12 and 15

Claims 12 and 15 embody variations on the bearing disclosed by claim 1 of the patent. Claim 12 describes a bearing which is "split longitudinally" and with which "means are provided to adjust its bore diameter by varying the distance between the oppositely facing edges produced by the split." Claim 15 refers to a bearing with a "longitudinal opening extending from one end to the other" which permits the shaft on which the bearing moves to be supported at various points without obstructing the movement of the bearing.

In one respect, the two claims are similar. The longitudinal opening referred to in claim 15 is in reality a rather wide longitudinal split. Relevant to the validity of both claims, therefore, is the question of whether the concept of a split bearing was disclosed by the prior art. Defendant argues that this feature of the patent was disclosed by both Thomson patent 749 and British patent 1588. The court does not agree. The gap described in the Thomson patent (see specifications and Fig. 4) is only in the ball-race shell of the bearing and serves only as an aid in assembly. The exterior shell is not split in any way. The split in the ball-race member, therefore, cannot be used in the manner disclosed by the subject patent. The British patent does disclose the concept of a split bearing but is addressed to rotary bearings rather than linear motion bearings. The initial question which must be answered relative to both claims 12 and 15, therefore, is whether the feasibility of splitting a linear motion bearing would have been obvious to a person of ordinary skill in the art.

A finding of obviousness, however, will not foreclose further inquiry into the validity of the patent. More than a general awareness of the possibility of splitting such a bearing is necessary to render the subject matter of claims 12 and 15 unpatentable. An additional determination that splitting was an obvious way of dealing with the problems addressed in those claims would be required. Of course, a finding favorable to the patent on either of these issues would be sufficient to sustain the validity of the claims. None of the prior art patents cited by defendant identically disclose splitting as a method of dealing with either of the problems addressed by claims 12 and 15, at least to the extent that these problems relate to linear motion bearings. This much should have been apparent at the close of the previous discussion of the feasibility of splitting such bearings. The British patent, however, suggests the use of this technique in dealing with the adjustment problems referred to in claim 12.

The feasibility of longitudinally splitting a linear motion bearing would have been obvious to a person having ordinary skill in the art. The operative principle of such bearings, as disclosed by the French patent, involves the use of independent oval raceways running in a longitudinal direction. It was apparent from this disclosure that a split placed between raceways would not adversely affect the operation of the bearing.

The use of a split or opening as a solution for the problems addressed by claims 12 and 15 would similarly have been obvious. The concept of splitting a cylinder in order to facilitate movement of that cylinder over a shaft onto which other structures are attached—supports in claim 15—is old indeed. An analogous use of this technique can be found in the catch of a common umbrella. There, the

cylinder which moves along the central shaft of the umbrella is split or cut along a portion of its length to make it possible for the cylinder to be retained by the catch. The use of a split for purposes of adjustment, as in claim 12, was made obvious by the British patent. It may not have been absolutely clear from the British patent that this technique could have been successfully applied to linear motion bearings. It is fair to say, however, that the British disclosure suggested splitting as a probable solution to the adjustment problem.

Claims 12 and 15 are, therefore, invalid.

*Patent Infringement*

■ The procedure preferred in this circuit for the disposition of patent litigation is for the trial court to determine the infringement issues notwithstanding a decision on patent validity which seemingly renders them moot. Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp., 372 F.2d 263 (2d Cir. 1967). For this reason, the court will now consider these issues.

■ It is the plaintiff's position that claims 1 and 2 of the patent are infringed by the "Ease" bearing and that claims 7, 12 and 15 are infringed by the types of linear motion bearings which are currently being offered by defendant. The court is in accord with plaintiff's contention concerning claims 1 and 2. The "Ease" bearing is identical in all material respects with the bearing disclosed by those claims. Most important, of course, is the fact that it has an outer sleeve which is indented at spaced intervals to form raised portions on its internal surface, which raised portions serve as working tracks for the balls under load. Of relevance, also, is the infringing design of the inner sleeve, which contemplates punch-press formation in a manner identical to that of the patent in suit. Defendant, however, was only a distributor of "Ease" bearings and not a manufacturer of them. Its only act of in-

fringement relative to the "Ease" bearing was its submission of a sample of the bearing to Microtol Industries in 1963. Apart from this, defendant has not manufactured, distributed or offered for sale in the United States the "Ease" bearing or any other bearing having an indented outer sleeve. There has, therefore, been no showing of probable irreparable injury.

Plaintiff's assertion concerning claims 7, 12 and 15 is somewhat less secure. Claim 7 describes raised portions on the internal surface of the outer sleeve without reference to the indentations mentioned in claims 1 and 2, and end rings which extend into and are pressed against the ends of the inner sleeve "whereby the latter is held in a vise-like grip by the end rings and the ends of the outer sleeve." The linear motion bearings currently offered by defendant have raised portions on the internal surface of their outer sleeves and to this extent clearly infringe claim 7. A similar statement cannot be made with respect to the end rings which appear on defendant's bearings. The end rings described in claim 7 both hold the parts of the bearing together and prevent the sleeves of the bearing from rotating relative to each other. The end rings in defendant's bearings screw into the bearings and perform only the function of holding the parts together. Rotation is prevented by raised ribs on the inner sleeve which register with grooves in the outer sleeve. These differences are sufficient to negative the claim of infringement.

Plaintiff has successfully proven infringement of claims 12 and 15. Defendant's catalogues offer both adjustable split and open linear motion bearings.

*Trademark Infringement and Unfair Competition Claim*

■ Plaintiff's claim of trademark infringement and unfair competition is based upon the manner in which the defendants used or threatened to use the name "Thompson" in connection with the solicitation of business and sale of de-

fendants' bearings. Since plaintiff's application for registration of the trademark "Thomson" was made subsequent to the commencement of this action, it relies entirely on its common law right. Its ability to recover pursuant to that right is dependent upon New York law, notwithstanding the fact that the jurisdiction of this court is based upon 28 U.S.C. § 1338(b), the pendent jurisdiction statute. Flexitized Inc. v. National Flexitized Corp., 335 F.2d 774 (2d Cir. 1964), *cert. denied,* 380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799 (1965).[9]

█ Trademark protection is not afforded a common, generic or surname unless it has acquired such special significance in the public mind that when the name is associated with a product, the public identifies the name as the source of the product. Playland Holding Corp. v. Playland Center, Inc., 1 N.Y.2d 300, 152 N.Y.S.2d 462, 135 N.E.2d 202 (1956); Ball v. United Artists Corp., 13 App.Div.2d 133, 214 N.Y.S.2d 219 (1st Dept. 1961); Santa's Workshop, Inc. v. Sterling, 2 App.Div.2d 262, 153 N.Y.S. 2d 839 (3d Dept. 1956), affirmed, 3 N.Y. 2d 757, 163 N.Y.S.2d 986, 143 N.E.2d 529 (1957). The names "Thomson" and "Thomson Industries" have acquired such special significance in the rotary and linear motion bearing fields. Prior to defendants' challenge, plaintiff virtually occupied the entire linear motion bearing market.

Defendant corporation entered the bearing market with the intention of imitating the plaintiff's mark. Its emphasis of the name "Thompson" in 1963, both in its catalogue and in the inscription on its bearings, reflected its desire to have the consuming public confuse its bearings with those manufactured by the plaintiff. Although intention to imitate and bad faith are not essential elements of the plaintiff's case, they are, if shown, relevant to the likelihood of confusion. Sig-

nificant changes in the presentation of defendant's bearings were instituted some time in 1966. Defendant corporation began identifying its bearings through the use of the trade name "Iko." It, moreover, refrained from using the name "Thompson" without including the remainder of its corporate name, i. e., Nippon Thompson Co., Ltd.

█ Plaintiff's right to trademark protection is but a part of its broader right to be protected against unfair competition. Dell Publishing Co. v. Stanley Publications, Inc., 9 N.Y.2d 126, 133, 211 N.Y.S.2d 393, 398, 172 N.E.2d 656, 660 (1961). The law will enjoin a party from the use of a corporate name where it so closely resembles the name of another corporation that it is likely to produce confusion to the injury of the corporation to which the name belongs. David B. Findlay, Inc. v. Findlay, 18 N. Y.2d 12, 271 N.Y.S.2d 652, 218 N.E.2d 531, *cert. denied,* 385 U.S. 930, 87 S.Ct. 289, 17 L.Ed.2d 212 (1966); Ball v. United Artists Corp., 13 App.Div.2d 133, 136, 214 N.Y.S.2d 219, 223 (1st Dept. 1961). It is no answer that the corporate name in question was not initially assumed for the purpose of infringement or unfair competition. A person may not use even his own surname to violate another's rights. David B. Findlay, Inc. v. Findlay, *supra.*

### Disposition

Count 1 is dismissed. Plaintiff is entitled to an injunction preventing defendants' use of the name "Thompson" in connection with the manufacture, sale and distribution of bearings or in connection with any related field in any manner other than in the full corporate name of defendant corporation, i. e., Nippon Thompson Co., Ltd.

So ordered.

9. Because of the multi-national flavor of this action, the New York conflict of laws rule must be consulted. Flexitized Inc. v. National Flexitized Corp., *supra.* This court concludes that under the grouping of contacts test elucidated in the leading case of Babcock v. Jackson, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279, 95 A.L.R.2d 1 (1963), the substantive law of New York should apply to this issue.