**SEARS, ROEBUCK AND CO., and Allstate Insurance Company, Plaintiffs,**

v.

**ALLSTATE DRIVING SCHOOL, INC., Defendant.**

**No. 64–C–1105.**

United States District Court
E. D. New York.
June 5, 1969.

**6**

Sprague, Dwyer, Aspland & Tobin, Mineola, N. Y., for plaintiffs, John E. Regan, Burton T. Ryan, New York City, of counsel.

Nicholas A. Clemente, Brooklyn, N. Y., for defendant.

ZAVATT, Chief Judge.

Plaintiffs seek an order "permanently enjoining the defendant from using the name 'Allstate' or any imitation thereof, in connection with its business." The first cause of action is brought by both plaintiffs. Relief is requested under the Lanham Act, specifically 15 U.S.C. § 1114(1),[1] for infringement of plaintiffs' marks and for common law unfair competition. The court has jurisdiction to hear these claims by virtue of 28 U.S.C. § 1338(a), (b).[2] The second cause of action is brought solely by plaintiff Allstate Insurance Company (Allstate Insurance). Injunctive relief is sought under section 368–d of the New York General Business Law, McKinney's Consol.Laws, c. 20.[3] Jurisdiction to hear this claim is based on diversity of citizenship between the parties, 28 U.S.C. § 1332.

Plaintiff Sears, Roebuck and Co. (Sears) adopted the name "Allstate" for use in connection with the sale of automobile tires in 1926 following a contest in which participants proposed names for Sears' new tire. It has since extended the name to numerous other automobile accessories (approximately 4000), and has limited the name to automotive related products. Beginning in 1927, Sears registered the name "Allstate" with the United States Patent Office.

---

1. § 1114. Remedies; infringement; innocent infringement by printers and publishers

(1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

shall be liable in a civil action by the registrant * * *

2. § 1338. Patents, copyrights, trade-marks, and unfair competition

(a) The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, copyrights and trade-marks. Such jurisdiction shall be exclusive of the courts of the states in patent and copyright cases.

(b) The district courts shall have original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the copyright, patent or trade-mark laws.

3. § 368–d. Injury to business reputations; dilution

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

In the margin is a list of the "Allstate" trademark registrations owned by Sears as of November 7, 1963.[4]

Plaintiff Allstate Insurance is a wholly owned subsidiary of Sears. Since its incorporation in 1931 it has used the name "Allstate" in its corporate name and in connection with the sale of automotive and other lines of insurance. It has registered with the United States Patent Office the name "Allstate" and several slogans incorporating that name as indicated in the margin.[5] In addition, it has registered the name "All-

4.

| Registration Number | Date Registered | Goods |
|---|---|---|
| 226,693 | 4–19–27 Renewed 4–19–47 | Vehicle Tires and Tubes of Rubber or Rubber and Fabric |
| 514,230 | 8–23–49 | Chemical Preparations used for Automobile Supplies |
| 524,389 | 4–25–50 | Automobile Dust Cloths and Brushes |
| 526,246 | 6–13–50 | Tow Ropes, Steel Wire Tow Cables |
| 528,288 | 8–1–50 | Automobile Supplies and Accessories |
| 529,040 | 8–15–50 | Automobile Testing Equipment |
| 530,555 | 9–12–50 | Automobile Fuels and Lubricants |
| 531,440 | 10–3–50 | Adhesives for Use in Automobiles |
| 532,724 | 10–31–50 | Automobile Oil Filters |
| 545,822 | 7–31–51 | Paints and Dressings for Automobiles |
| 545,866 | 7–31–51 | Automobile Sponges and Chamois and Gasket Material |
| 548,964 | 10–2–51 | Automobile Door Locks, Locking Gas Tank Caps |
| 549,796 | 10–23–51 | Automobile Tires |
| 550,934 | 11–20–51 | Tires and Tubes and Other Automobile Parts |
| 563,528 | 9–2–52 | Automobile Cleaning and Polishing Compositions |
| 586,026 | 2–23–54 | Automobile Parts and Accessories |
| 595,839 | 9–28–54 | Automobile Supplies |
| 596,333 | 10–5–54 | Automobiles and Motor Vehicle Structural Parts and Accessories |
| 606,448 | 5–24–55 | Mens Clothing |
| 662,513 | 6–3–58 | Electric Toy Trains and Accessories |
| 744,227 | 1–22–63 | Fueling, Maintenance and Light Repair Services for Automotive Vehicles. |

5.

| Registration Number | Date Registered | Description |
|---|---|---|
| 621,917 | 2/21/56 | "ALLSTATE," for automobile insurance. |
| 621,918 | 2/21/56 | Slogan "You're in Good Hands with ALLSTATE" with picture of two hands holding an automobile, for automobile insurance. |
| 671,339 | 12/16/58 | Slogan "You're in good hands with ALLSTATE" with picture of two hands holding a house and an automobile, for automobile and other insurance. |
| 823,149 | 1/24/67 | "ALLSTATE GOOD DRIVER TRAINER" within a geometric design, which includes a picture of two hands holding an automobile, for driver training program and films. |

state" and various pictures with the Secretary of State of New York as indicated in the margin.[6]

Sears sells its products through a chain of retail stores and its nationally prominent catalog. In its Eastern Territory (Maine to Pittsburgh and south to Virginia), Sears has 235 retail stores, including 12 within the four counties of Long Island (Kings, Queens, Nassau and Suffolk). National sales for tires marketed with the name "Allstate" presently yield approximately $200,000,000, and for batteries, $65,000,000. The sales volume in this territory is $60,000,000 for tires and $15–18,000,000 for batteries, representing 60% and 14% respectively of the total sales volume of products marketed under the trade name "Allstate" in the Eastern Territory. Sears does approximately $10,000,000 volume in automotive products, so trademarked, in the Long Island area alone.

Sears spends large sums advertising its Allstate line of products, mostly in newspapers and through distribution of the Sears catalog. In 1966 and 1967 Sears spent $4,000,000 and $4,500,000 respectively for newspaper advertising in its Eastern Territory. The cost of such advertising has been substantially the same since 1960. The Sears catalog presently enjoys a circulation of over 28,000,000. In 1960 the circulation was more than 9,000,000. In that year, 67 pages of the catalog were devoted to automotive products marketed under the appellation "Allstate." The 1960 catalog, as it related to automotive advertising, was typical of the ten year period prior to 1960. For the past six years the catalog averaged 97.5 pages dealing with Allstate automotive products.

Allstate Insurance is now a multiline carrier writing all forms of property insurance. It has been actively engaged in writing automobile insurance in New York State since May 1, 1936 and in 1952 added other lines. However, most of its total premium volume is on automobile insurance (90% until 1958, 83.2% in 1966). It was ranked second, nationally, in premium volume for automobile insurance for the year ending 1966, and first in New York State for that year. Its Eastern Zone (comprising the New England states and the states of New York, New Jersey, Pennsylvania and Delaware) presently accounts for $277,-000,000 in insurance premiums. 70% of which is for automobile insurance covering 1,500,000 automobiles. At the trial, it estimated its annual advertising expenses (for advertising on local and network television, radio, newspapers and magazines) for the years 1963–1966 based upon the percentage of the population of the "New York City area" residing in the Long Island area. It estimated the population of the Long Island area at 60.2% of that of the "New York City area" and allocated to the Long Island area 60.2% of its total cost of $2,323,473 for advertising in the "New York City area" during that period.

### Activities of Allstate Insurance in Driver Education

The plaintiffs rely heavily on the sampling survey (hereinafter referred to) and the activities of Allstate Insurance in the field of driver education, in their attempt to support their contention that the business of the defendant is likely to cause confusion in the minds of

| 6. | | Date | |
|---|---|---|---|
| | Number | Registered | Description |
| | S–35 | 3/16/62 | "ALLSTATE," for insurance. |
| | S–36 | 3/16/62 | Picture of two hands holding an automobile and a house, for insurance. |
| | S–172 | 7/23/63 | "You're in Good Hands with ALLSTATE," for insurance. |
| | S–173 | 7/23/63 | Picture of two hands holding a truck. |

those who avail themselves of the services of the defendant.[7]

### Discount Program

Since 1952 Allstate Insurance has been giving discounts on automobile insurance premiums to youngsters who successfully complete a driver education course at their local high schools. The only requirement appears to be that the course be approved by the appropriate state agency. The record indicates that other insurance companies likewise offer such discounts. There is nothing before the court which indicates the amount of publicity given this program by Allstate Insurance.

### Allstate Foundation Grants

In 1952 Allstate Insurance chartered a nonprofit organization, The Allstate Foundation, in order to channel funds into various safety-related activities. All funds received by the Foundation emanate from Allstate Insurance. So far, the Foundation has contributed over $1,000,000 to various colleges which use the funds to provide scholarship grants for college-level courses in driver education given to high school driver education instructors. The hope is that, after such a course, these high school instructors will be better qualified to give a driver education course to their students. A total of forty colleges and universities have received grants under this program and, since 1955, an average of thirty seven colleges and universities have participated each year. Approximately 12,700 high school teachers have received scholarship grants originating from this Foundation and they, in turn, have taught over 2,000,000 students.

Apparently there is no extensive publicity program connected with the scholarship grants. Annual news releases are prepared by Allstate Insurance for national distribution which list the participating colleges for a particular year. In addition, some of the colleges submit their own news releases to local newspapers. While some high schools publicize that their teachers were trained by college courses paid for by this program, it is not a common practice for them to do so. The form of application for a grant by a high school teacher to take the course states that the scholarship funds have been provided by the Allstate Foundation. Allstate Insurance is not identified as the source from which the Foundation receives its funds. Apparently there is some concern that such publicity might adversely affect the tax-exempt status enjoyed by the Foundation.

### Good Driver Trainer Program

A slightly more publicized driver education activity, sponsored by Allstate Insurance and identified with it rather than the Allstate Foundation, is the Good Driver Trainer Program. Allstate Insurance derives no profit from the production or sale of a series of eleven films designed to aid in the driving instruction of high school students. The films are used by many high schools in conjunction with the Link Driver Simulator, a machine designed to reproduce in the classroom (when coordinated with the films) simulated driving situations. These trainers are not designed, manufactured or furnished by either plaintiff. The films credit their production to the Training Division of Allstate Insurance Company. Two hundred and twenty seven schools use the Link Simulator and the Allstate Insurance films. Thirteen schools use them in New York State, including five in the Long Island area. Eight to ten thousand brochures which identify Allstate Insurance with this program, are distributed annually upon request and at trade shows, explaining the nature of the films to prospective users. The interest which Allstate Insurance has in driver education is publicized by advertisements in national magazines and trade publications which urge communities to develop high school

---

7. It should be noted at this point that neither of the plaintiffs operates a driving school under the name "Allstate" or under any other name.

programs using the Link Simulator and the Allstate Insurance films.

### Safety Literature

Numerous pamphlets dealing with safety in driving are distributed to high schools each year for use by high school students in driver education courses. These pamphlets have been cleared by the National Education Association for use in schools as free from commercial propaganda. However, the pamphlets are clearly identified as having been published by Allstate Insurance.

### Other Activities

Allstate Insurance frequently sends representatives to meet with governmental agencies concerned with improving driver education programs in their respective states and with various civic groups, in order to alert them to the importance of community action in the field of driver education. In addition, it maintains a limited program whereby it undertakes to train drivers who are working for companies whose vehicles are covered by Allstate Insurance fleet policies. It does so in order to help their insureds to lower their accident rates.

### Allstate Driving School, Inc.

The defendant, Allstate Driving School Inc. (Driving School), is a New York corporation organized on February 10, 1964. Prior to that date, and since 1961, its President, Mr. Robert Byrne, and another were doing business as a partnership under the name Allstate Driving School. Byrne is now the only full-time employee of Driving School but there is one part-time employee who gives driving instruction on Saturdays. Byrne presently uses one car, with dual controls, in the operation of the School, and the greatest number of cars ever owned by the School was two. The business operates out of Mr. Byrne's residential address in Commack, Suffolk County, New York. Since the policy of Driving School is to pick up students (a majori-

ty of whom are adults) at their homes, it would be impractical to service communities distant from Commack. As a result, approximately 80% of Driving School's business comes from within an 8 to 10 mile radius of Mr. Byrne's home.

Since 1966 Driving School has advertised exclusively in the classified telephone directory for Suffolk County. In prior years other advertising was placed in several local newspapers on Long Island and a small sign was placed for one season at the Islip Speedway. The advertising expenses of the defendant since 1961 averaged somewhat over $2000 per year. A total of approximately 2000 persons have been taught to drive by the defendant and its predecessor partnership since 1961.

### Adoption of Name by Defendant

In 1961 Mr. Byrne and a Mr. Curatola formed a partnership to conduct a driving school. Curatola had been an employee of other such schools in the past but this was Byrne's first venture into this field. They originally attempted to file an application with the Bureau of Motor Vehicles for authorization to operate a driving school under the name "Island Auto School."[8] It was rejected on January 5, 1961 because another school was then operating under that name. Subsequently they submitted an application under the name of "State Auto School" which was also rejected by a clerk at the Bureau on February 7, 1961, who said that the name "State" could not be used. The clerk suggested that if the word "State" were preceded by some word, the application would be accepted. She suggested "Allstate." Whereupon, Byrne amended the application in her presence and filed it. The application was accepted formally on June 14, 1961, whereupon a license (No. C951) was issued by the New York State Department of Taxation and Finance, Bureau of Motor Vehicles which enabled Byrne and his partner to conduct a driving school under the name "All-

---

8. See N.Y. Vehicle and Traffic Law § 394 subd. 2, McKinney's Consol.Laws, c. 71.

state Driving School." [9]  I find that defendant adopted the name "Allstate" without the intent to trade upon the reputation of either plaintiff.

### Request that defendant Cease and Desist

Before the New York Bureau of Motor Vehicles will issue a certificate to conduct a driving school, the applicant is required to submit proof of adequate insurance. See 15 N.Y.C.R.R. § 76.11 (Current regulation promulated by Commissioner of Motor Vehicle pursuant to Vehicle and Traffic Law § 394, subd. 2). New York State assigns such applicants to an insurance company under its assigned risk plan. Byrne and Curatola were assigned to the plaintiff, Allstate Insurance, at the time their first application (to use the name Island Auto School) was before the Bureau. Allstate Insurance issued the requisite insurance to Island Auto School. When the Bureau certificate was finally issued to Byrne and Curatola, authorizing the trade name "Allstate Driving School," they requested Allstate Insurance to change the name of the insured to "Allstate Driving School." Thus, Allstate Insurance (through its Huntington, Long Island, office) became aware, during August 1961, that Byrne and Curatola were operating a driving school under that trade name. In September of that year, its Associate Counsel wrote a letter to Byrne and Curatola requesting them to cease using the name "Allstate," claiming that such use was an infringement of the right of both plaintiffs to use that name. He received no reply to that letter. Allstate Insurance did not communicate further with the driving school until it sent its second letter, dated April 6, 1964. By this time the school was being operated only by Byrne in corporate form. Bryne gave a negative response to either this second letter or to a subsequent letter. Whereupon, plaintiffs filed their complaint in this action on November 12, 1964.

9. Thereafter, and on February 10, 1964, the defendant was incorporated. It held,

## LANHAM ACT

### Secondary Meaning

The mark "Allstate" is an exceedingly weak mark. It is composed of two words in common usage and might, in addition, be said to be descriptive of the wide geographic dispersion of plaintiffs' businesses. An example of a strong mark, on the other hand, would be "Kodak," a fanciful creation having no common meaning. An indication that the mark is a weak one and not a fanciful creation is its use in the metropolitan New York area by at least 103 other companies, none of which is connected in any way with either of the plaintiffs. Cf. Allstate Insurance Co. v. Allstate Investment Corp., 210 F.Supp. 25 (W.D. La.1962), aff'd. 328 F.2d 608 (5th Cir. 1964). As a general proposition, weak marks will not be protected under the trademark laws unless they have acquired a secondary meaning. See, e. g., W. E. Bassett Co. v. Revlon, Inc., 354 F.2d 868 (2d Cir. 1966). A mark develops a secondary meaning if "because of association with a particular product or firm over a period of time [the mark] has come to stand in the minds of the public as a name or identification of that product or firm." Safeway Stores, Inc. v. Safeway Properties, Inc., 307 F.2d 495, 499 (2d Cir. 1962).

In view of the extensive advertising by Sears of its automotive accessories identifying them with the mark "Allstate," the extensive advertising by Allstate Insurance of its automotive and other lines of insurance and the substantial volume of business done by both plaintiffs over a long period in connection with Allstate products and services, I find that "Allstate" has acquired a secondary meaning in the respective areas of its exploitation by both plaintiffs.

### Likelihood of Confusion

The defendant should be enjoined from using the name "Allstate"

at the time of trial, Department of Motor Vehicle License No. D 0816.

only if the use of that name is likely to cause confusion as to the origin of defendant's service or plaintiffs' goods and services. 15 U.S.C. § 1114(1). See, e. g., Maternally Yours, Inc. v. Your Maternity Shop, Inc., 234 F.2d 538 (2d Cir. 1956); Admiral Corp. v. Penco, Inc., 203 F.2d 517 (2d Cir. 1953); LaTouraine Coffee Co. v. Lorraine Coffee Co., 157 F.2d 115 (2d Cir.), cert. denied, 329 U.S. 771, 67 S.Ct. 189, 91 L.Ed. 663 (1946). It is settled that the plaintiff in an infringement action need not prove that actual confusion or deception has already occurred but, rather, he must establish that such confusion is likely. See, e. g., Harold F. Ritchie, Inc. v. Chesebrough-Pond's Inc., 281 F.2d 755 (2d Cir. 1960); Admiral Corp. v. Penco, Inc., supra. It is to be noted, however, that if evidence of substantial actual confusion is offered, a finding of likelihood of confusion may be more readily made. See Continente v. Continente, 378 F.2d 279 (9th Cir. 1967); Harold F. Ritchie, Inc. v. Chesebrough-Pond's Inc., supra; Field Enterprises Educational Corp. v. Grosset and Dunlap, Inc., 256 F.Supp. 382 (S.D.N.Y.1966); National Trailways Bus System v. Trailway Van Lines, 269 F.Supp. 352 (E.D.N.Y.1965).

■ The fact that neither plaintiff competes directly with the defendant in the sale of driving instruction does not per se preclude the granting of the relief they request. The existence or absence of direct competition between the parties is but one factor in determining whether there is a likelihood of confusion. See, e. g., Continental Motors Corp. v. Continental Aviation Corp., 375 F.2d 857 (5th Cir. 1967). The Second Circuit has long recognized that the mark of a prior user may be worthy of protection from use by one not in direct competition with the owner of the mark. S. C. Johnson & Son v. Johnson, 175 F.2d 176 (2d Cir.), cert. denied, 338 U.S. 860, 70 S.Ct. 103, 94 L. Ed. 527 (1949); Yale Electric Corp. v. Robertson, 26 F.2d 972 (2d Cir. 1928); Aunt Jemima Mills Co. v. Rigney & Co., 247 F. 407 (2 Cir. 1917), cert. denied, 245 U.S. 672, 38 S.Ct. 222, 62 L.Ed. 540

(1918). Such is the case when the goods or services with which the mark is used by the junior user are so related to those of the prior user that it would not be unreasonable to suppose that the prior user supplies those goods or services. L. E. Waterman Co. v. Gordon, 72 F.2d 272 (2d Cir. 1934). In S. C. Johnson & Son v. Johnson, supra, the court held that this protection, which was available under the principles of unfair competition, was incorporated into the Lanham Act. The rationale of the policy of protecting a mark outside its immediate area of exploitation was clearly set forth by the Second Circuit in Yale Electric Corp. v. Robertson, supra:

"His mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mask." 26 F.2d at 974.

If the goods or services of the alleged infringer are so related to those of the prior user that it would be reasonable to conclude that they come from the same source, then protection is warranted in order to prevent the "good or ill repute of the one * * * [from being] visited upon the other." Chandon Champagne Corp. v. San Marino Wine Corp., 335 F. 2d 531 (2d Cir. 1964). See also Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492 (2d Cir.), cert. denied, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961); Admiral Corp. v. Penco, supra; National Trailways Bus System v. Trailway Van Lines, supra; Restatement, Torts §§ 729–31. On the facts of this case, I do not find that there is a likelihood of confusion as to the source of plaintiffs' or defendant's goods and services.

■■ It must be noted that in a case such as this, the judge, as the trier of facts, does not merely measure the credibility of witnesses, but he must form a

judgment or opinion as to the likelihood of confusion. One district judge, who is now on our Court of Appeals, expressed the decision-making process in a trademark case as follows:

"[The] determination * * * whether confusion is or is not likely to arise—does not readily lend itself to resolution by scientific appraisement or comparison. Rather, a finding on infringement is by necessity a subjective determination by the trial judge based on his visceral reactions as to the likelihood of confusion the allegedly infringing mark will create in the minds of the public. As noted by one court, in situations of this kind the Judge 'can only contemplate, speculate, and weigh the probabilities of deception arising from the similarities.' Colburn v. Puritan Mills, Inc., 7 Cir., 1939, 108 F.2d 377, 378." Societe Anonyme, Etc. v. Julius Wile Sons, 161 F.Supp. 545, 547 (S.D.N.Y.1958) (Kaufman, J.).

The factors to be weighed by the trial judge in his determination as to whether the use of the mark on noncompeting goods or services is likely to cause confusion as to the origin of those goods and services include: "the strength of his [the prior owner's] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product [or service], and the sophistication of the buyers." Polaroid Corp. v. Polarad Electronics Corp., supra, 287 F.2d at 495. See Restatement, Torts §§ 729–31. The Second Circuit has indicated that "the full bench of the court would now accept the propositions set forth in [Polaroid]." Triumph Hosiery Mills, Inc. v. Triumph Internat'l Corp., 308 F.2d 196 (2d Cir. 1962).

### Strength of the Mark

As noted previously in the discussion of secondary meaning, plaintiffs' mark is an exceedingly weak one. See supra at p. 11.

### Degree of Similarity

The names in question are identical. However, Allstate Insurance often advertises its product in combination with its pictorial mark (cupped hands holding a car and/or house) and the slogan "You're in good hands with Allstate." Defendant does not use its name in conjunction with any such slogan or pictures. Its use does not appear to suggest that the "good hands" people are responsible for defendant's driving instruction.

### Proximity of the Products and Services

Some of the variables to be considered under this heading include: [10]

(1) the extent to which the service of the defendant and the goods and services of the plaintiffs have common purchasers;

(2) the extent to which the defendant's service and the plaintiffs' goods and services are marketed through the same channels; and

(3) the relation between the purposes of the goods and services of the respective parties.

It is evident that customers of defendant are also prospective customers of both plaintiffs. Plaintiffs sell automobile accessories and automobile insurance and defendant's customers learn to drive automobiles and hence they and their families are prospective, and possibly current, users of the type of goods and services marketed by the plaintiffs. See Sears, Roebuck & Co. v. Johnson, 219 F.2d 590 (3d Cir. 1955) where the court in a case also involving a driving school gave great weight to this factor.

In the instant case, it is clear that Sears automotive products and Allstate Insurance's automobile liability insurance, on the one hand, and defendant's driving instruction on the other are not marketed in the same manner or sold in the same establishments. Similarly, Allstate Insurance's activities in the field of

10. See Restatement, Torts § 731.

driver education revolve around public high schools and are in no way connected with any commercial learn-to-drive establishment. The evidence indicates that the general public is not aware of Allstate Foundation or the source of its funds.

As far as the relationship between the purpose or function of Allstate Insurance's actvities in driver education and those of the defendant, they are obviously related in end product, namely the instruction of prospective drivers, but they differ in motivation. Allstate Insurance seeks to improve the training of safe drivers by others in furtherance of its long range objective to reduce the number and amount of claims against its insureds. The defendant seeks to exploit commercially the desires of nondrivers to obtain their driving licenses. It should also be noted that the students who benefit from Allstate Insurance's program are of high school age while most of defendant's students are adults.

### Likelihood Prior Owner Will Bridge Gap

There was no evidence adduced at the trial regarding Sears' or Allstate Insurance's intention to operate a commercial driving school. Since Allstate Insurance is currently supporting an effort to induce high schools to establish driver education courses and is rendering valuable assistance in the preparation of the courses, it is not inconceivable that, at some future date, plaintiffs might wish to establish their own course of instruction. It is doubtful, however, that Allstate Insurance's primary purpose in rendering assistance to the high schools, i. e., the training of safe and reliable new drivers with a concomitant reduction in the number of automobile accidents (and hence fewer claims), would in any way be furthered by plaintiffs' direct participation in driving instruction programs. Allstate Insurance is not the only one in its field to support high school driver education programs and there is no testimony that any other insurance company has ventured into the commercial driving school business.

### Actual Confusion

No one testified at the trial that he enrolled at Driving School because he was under the impression that it was operated or sponsored by either plaintiff or that he would be eligible for Allstate Insurance's special discount if he took the course given by the defendant. In fact, no prospective or actual student of the defendant or in any high school was called to testify nor was any high school teacher, who was the beneficiary of the Allstate Foundation grants to colleges so called. Whether or not the survey conducted for the plaintiffs indicates some actual confusion will be commented upon later.

### Defendant's Intent

■ Conscious imitation by the defendant would be strong evidence of possible confusion. See, e. g., Harold F. Ritchie, Inc. v. Chesebrough-Pond's Inc., supra; National Trailways Bus System v. Trailway Van Lines, supra.

■ The circumstance under which Byrne adopted the name "Allstate" does not justify a finding that he deliberately chose that name in order to trade on plaintiffs' good will and reputation. The testimony in this case may be contrasted with that in Sears, Roebuck & Co. v. Johnson, supra. In that case the defendants offered no explanation for their adoption of the name "Allstate" and the Third Circuit noted that they remained silent at their peril since they and not the plaintiff had the burden on this issue. A finding that there was no intent to pass off defendant's service as that of plaintiffs strengthens a finding of the absence of a likelihood of confusion. Jean Patou, Inc. v. Jacqueline Cochran, Inc., 312 F.2d 125 (2d Cir. 1963).

### Quality of Defendant's Services

No direct evidence was adduced regarding the quality of the driving instruction offered by Driving School. However, the school uses dual control cars, maintains a customer pick-up service, and the principal instructor, Mr. Byrne, has taken three courses in driver education at New York University.

*Sophistication of the Buyers*

█ In determining whether there is a likelihood of confusion as to the source of defendant's service, the test is the likelihood that an appreciable number of ordinarily prudent prospective purchasers will be confused. See, *e. g.*, Maternally Yours, Inc. v. Your Maternity Shop, Inc., *supra*; Avon Shoe Co v. David Crystal, Inc., 279 F.2d 607 (2d Cir.), cert. denied, 364 U.S. 909, 81 S.Ct. 271, 5 L.Ed.2d 224 (1960); General Motors Corp. v. Cadillac Marine & Boat Co., 226 F.Supp. 716 (W. D.Mich.1964); Atlantic Monthly Co. v. Frederick Ungar Publishing Co., 197 F. Supp. 524 (S.D.N.Y.1961); American Luggage Works, Inc. v. United States Trunk Co., 158 F.Supp. 50 (D.Mass. 1957), aff'd sub nom., Hawley Products Co. v. United States Trunk Co., 259 F.2d 69 (1st Cir. 1958). We are concerned with the ordinary purchaser " 'exercising due care in the market place * * *.' " Seven-Up Co. v. The Get-Up Corp., 340 F.2d 954 (6th Cir.), cert. denied, 382 U.S. 901, 86 S.Ct. 235, 15 L.Ed.2d 155 (1965). This is not the type of case where two low price products, used for the same or similar purposes, are marketed side by side in a supermarket and purchased with a minimum of care even by a reasonably prudent shopper. Driving instruction is not inexpensive, and it would be unreasonable to asume that purchasers of such instruction make hasty decisions merely upon seeing the name of the school. Factors such as location of the school, the school's equipment, its reputation, the content of its advertising, and possibly even the personality of the instructor might influence one to select a particular school. Mr. Byrne testified that much of his business results from recommendation of satisfied customers. A perusal of the advertisements placed by the defendant in local newspapers and the classified directory for Suffolk County indicates that an ordinarily prudent person about to contract for driving instruction is not likely to be persuaded, by those ads, that defendant is in any way connected with either of the plaintiffs. One advertisement indicates that Driving School services Huntington and Smithtown Townships; another indicates the address of the operation to be 10 Palmer Lane in Commack, a residential area; still another advises readers to call an alternative telephone number "if no answer" on the first number. None of the advertisements made available to the court evidence any intention to trade upon plaintiffs' marks and reservoir of good will. In fact, they established clearly that defendant is merely a local commercial operation. See Fieldcrest Mills, Inc. v. Couri, 220 F.Supp. 929 (S.D.N.Y. 1963); Societe Anonyme, etc. v. Julius Wile Sons, *supra. Cf.* W. E. Kautenberg, v. Ekco Products Co., 251 F.2d 628 (Customs and Patent Appeals 1958).

*Public Opinion Survey*

Prior to the trial of this case, and in preparation for it, plaintiffs engaged a market analyst to conduct a telephone survey in order to try to establish that the public is likely to be confused as to the origin of defendant's services. They had hoped that the survey would indicate that a large number of persons responding to it were actually confused, and that therefore, the court would draw the inference that there was a strong likelihood of confusion as to the origin of defendant's services. The results of the survey were offered through the testimony of Albert Sindlinger, President of Sindlinger & Co., located in Philadelphia, Pennsylvania. Mr. Sindlinger supervised the preparation of the survey questionnaire,[11] and the tabulation of the results. Two interviewers and one supervisor testified. All but three of the remaining interviewers were available in court to testify. The parties stipulated that these people would give the same answers to the questions posed as those who did testify.

999 telephone interviews were tabulated over a two week period by 24 women who were part-time employees of Sindlinger & Co. Every telephone call was placed from Philadelphia to a Suffolk

11. See Appendix.

County residential subscriber chosen by a random selection procedure devised by Sindlinger. These employees, all but two of whom were high school graduates, worked approximately 20 hours per week at the rate of $1.60 per hour (the minimum wage). They were not skilled or experienced public opinion researchers. They had received preliminary "training" for a three day period. It consisted of listening to telephone calls made by other Sindlinger employees for other surveys. They were able to listen only to the questions posed by the interviewers; they could not overhear the responses to those questions. They received no special instructions regarding the manner of asking questions, or of recording responses. The nature of the tabulating process required that short responses be recorded. Therefore, summaries of actual answers were recorded where the answers were too long to record verbatim. Supervisors could have monitored any interview they chose to, but they generally did so only when a particular interviewer requested assistance. Since many other surveys were being conducted by Sindlinger & Co. during this period, the supervisors could not be sure that any interviews were monitored in this particular survey.

The answers which were recorded by the interviewers were coded and tabulated according to Sindlinger's instructions. The report containing the computer tabulation of the responses was received in evidence (Ex. 42). The defendant, after initially objecting to its admissibility at the trial, now concedes that it was properly admitted, but argues that very little weight ought to be attributed to the findings. The report indicates that 37.-6% of the respondents were of the opinion that Sears owns or operates the Allstate Driving School, and that an additional 12.2% thought that Allstate Insurance owns or operates the Allstate Driving School. Other responses such as "Allstate Company" and "Allstate" are inconclusive as far as plaintiffs seek to interpret them as further evidence of confusion. Finally, 39.1% responded that they did not have an opinion as to the owner-ship or operation of the Allstate Driving School. The results are much more impressive when restricted to those respondents who had an opinion (60.1% of the total sample). Of these 61.8% indicated that in their opinion Sears owns or operates the Allstate Driving School, and 20.-1% indicated Allstate Insurance. Thus, 49.8% of the total sample (which includes those who "didn't know") were of the opinion that one of the plaintiffs owns or operates the Allstate Driving School, while 81.9% of those who had an opinion indicated that one of the plaintiffs owns or operates the Allstate Driving School. This survey is not of sufficient weight to persuade the court, in the light of all the other evidence in the case, that the ordinary prospective purchaser is likely to be confused as to the origin of defendant's services. There are several inadequacies in the design and execution of the survey which lead the court to give it little weight. Only some of the more serious are analyzed here.

The women who conducted the telephone interviews were low paid, part time employees of Sindlinger & Co. rather than professional public opinion researchers. Their brief training period did not even include their observation of a single complete interview. That is, they heard only the questions asked and they observed the recording of the responses, but they never heard the responses personally. Since the accuracy of a survey such as this depends heavily on the good judgment of the interviewers, this training deficiency is particularly relevant when weighing the results. Unforeseen circumstances may arise which must be solved quickly by the interviewer without the assistance of a supervisor. Recording errors may occur not only through inadvertent error, but also when an interviewer exercises poor judgment in interpreting a response. See H. C. Barksdale, The Use of Survey Research Findings as Legal Evidence 28, 33 (1957). The evidence in this case indicates that the interviewers were indeed often called upon to interpret and sum-

marize responses so that they could later be coded for computer tabulation.

For example, in answer to the question "In your opinion—who owns or operates the Allstate Driving School?" 3.5% responded with "Allstate Company" and 4.4% with "Allstate." While these responses were accurately recorded, there is certainly a danger that many of the other responses which should have been tabulated in these categories (and thus less helpful to plaintiffs) were coded as "Allstate Insurance Co." The danger is amplified by the fact that the term "Allstate" has a secondary meaning widely known to the general public and hence probably to the interviewers and, therefore, interviewers exercising poor judgment might have improperly recorded the response "Allstate Company" or "Allstate" as "Allstate Insurance Co." It would appear obvious that if professionals were not to be used then at the very least it would have been wiser to provide interviewer trainees with the opportunity to overhear a sampling of responses so that they might have gained useful experience in interpretation and recording.

The questionnaire itself raises serious problems. Question 19 is the key to the study ("In your opinion—who owns or operates the Allstate Driving School?"). However, the sequence in which the questions were asked, and the content of the other questions, necessarily had an impact on the nature of the responses. See H. C. Barksdale, *supra*, at 27; Sorensen & Sorensen, The Admissibility & Use of Opinion Research Evidence, 28 N.Y.U.L. Rev. 1213, 1249 (1953). *Cf.* Sears, Roebuck & Co. v. All States Life Insurance Co., 246 F.2d 161 (5th Cir. 1957); General Motors Corp. v. Cadillac Marine & Boat Co., *supra*. One of the dangers inherent in an ex parte solicitation of public opinion was noted in National Biscuit Co. v. Princeton Mining Co., 137 U.S.P.Q. 250 (1963):

"It is of course recognized that proof of a substantial amount of actual confusion of marks as an incident to bona fide purchases of goods under the normal circumstances and conditions surrounding the sale thereof constitutes the best evidence of continued confusion of the marks. On the other hand, a survey, such as that of opposer, intended to demonstrate the same thing, and not conducted in the presence of other persons who might be vitally concerned therewith, might frequently be carried out in such a manner, whether designedly or not, as practically to insure the desired results, and it ordinarily would be impossible to ascertain from the recollections of the persons participating therein what factors of conversation, expression or the like may have been responsible for the results obtained." 137 U.S.P.Q. at 253.

The Fifth Circuit in Sears, Roebuck & Co. v. All States Life Insurance Co., *supra*, went so far as to say that:

"[I]t is not truly illustrative of what the public thinks to permit one party to propound questions [in a survey] chosen on its behalf, however fairly attempted, with no opportunity given to the other party to test the answers given by the persons interviewed." 246 F.2d at 172.

Two examples of suggestion readily come to mind. There are several introductory questions (4 through 10) included in the survey ostensibly for "interest value"; that is, to maintain the interviewee's interest so that he or she will respond later to the key question. Question 6 asks "What does the name Coldspot mean to you?" Those who respond to this question without naming Sears (the manufacturer and retailer for Coldspot appliances) are then asked specifically "Where would you go to buy a Coldspot product?" The only correct answer to this inquiry would be Sears. At this very early stage of the questioning, therefore, the name Sears was brought to the attention of a large number of the respondents. *Cf.* Sears, Roebuck & Co. v. All States Life Insurance Co., *supra*, 246 F.2d at 170. In fact, almost 45% of those who completed interviews identified the trade name "Coldspot" with Sears.

The second example of suggestion appears by way of a series of questions

which, when considered together, might be characterized as leading. Before any mention is made of the Allstate Driving School interviewers asked, "What does the name Allstate mean to you?"; Have you ever bought any Allstate products?"; "What * * * and where did you buy it?"; Do you recall seeing the name Allstate mentioned recently in any advertisement anywhere?"; "What do you recall being advertised?". As this court has found, "Allstate" has developed a secondary meaning, and is widely known by consumers in the automotive related field to be a brand name for automobile accessories and insurance. Suffice to say, as might be expected, a large number of respondents associated "Allstate" with either or both plaintiffs, and had themselves purchased various "Allstate" products. Of course, that plaintiffs' trademark is widely known does not by itself indicate a likelihood of confusion. With this preliminary build-up accomplished, however, the questions begin to probe in the area of driving schools. Question 14(a) asks, "Can you name any driving schools that are located within the Suffolk County area?" If the response to this question did not include the Allstate Driving School, the respondent was asked, "Have you ever heard of the Allstate Driving School?" (Only 9.3% said that they had heard of the school and only 1.4% [fourteen persons] knew its correct location). Eventually the clincher is asked: "In your opinion—who owns or operates the Allstate Driving School?" It is not surprising that after Sears and its "Allstate" products were repeatedly brought to the attention of the respondents, who by this time were thinking of the plaintiffs, a large number were of the opinion that one or both of the plaintiffs owns or operates the Allstate Driving School.

One of the dangers inherent in a consumer reaction test is that it is not administered in the context of the market place. Respondents to such a test do not consider those factors which are relevant to the particular purchasing decision at hand. They must give their opinion in a vacuum without regard to the type of advertising or manner of marketing used in connection with the goods and services involved. See Sorensen & Sorensen, *supra*, at 1243. For example, the respondents to the survey in this case were unaware that the defendant advertised only in the Suffolk County classified telephone directory; that the school was operated from the owner's home, which was located in a residential area; that only one automobile was used for instruction. This danger is emphasized when they have been indoctrinated to think in terms of famous brand names in general (see question 4 to 9) and "Allstate" in particular, before being asked the $64 question, and where the survey is the only evidence of confusion. In no case which has come to the attention of the court, in which surveys were used to support a finding of a substantial likelihood of confusion, was the particular survey the only evidence relating to that issue. Concrete instances of actual confusion by purchasers were introduced to buttress the findings of the survey. See, *e. g.*, Standard Oil Co. v. Standard Oil Co., 252 F.2d 65, 76 A.L.R. 2d 600 (10th Cir. 1958); Sears, Roebuck & Co. v. Johnson, *supra*; Zippo Mfg. Co. v. Rogers Imports, Inc., 216 F.Supp. 670 (S.D.N.Y.1963); Seven-Up Co. v. Green Mill Beverage Co., 191 F.Supp. 32 (N.D. Ill.1961); Grove Laboratories v. Approved Pharmaceutical Corp., 149 F. Supp. 86 (N.D.N.Y.1957); United States v. 38 Dozen Bottles, 114 F.Supp. 461 (D. Minn.1953).

It is important to bear in mind that the relevant group with which we are concerned is the prospective puchaser of plaintiffs' or defendant's products and services. It is their confusion that would be noteworthy. In face of this legal imperative, the survey questionnaire does not inquire whether or not those interviewed had driver's licenses, or owned automobiles, or were considering taking lessons, etc. [They were asked whether they had already taken lessons]. In addition, it is arguable that the universe selected by Sindlinger for this survey, the entire County of Suffolk, was too large. Since

80% of defendant's business comes from within the 8 to 10 mile radius of the school, a more accurate sampling of prospective purchasers would have confined itself to this geographic area. See Sorensen & Sorensen, *supra*, at 1245.

### Conclusion

■ In view of the court's finding that there is no likelihood of confusion as to the origin of defendant's services, plaintiffs must fail on their claim for trademark infringement under the Lanham Act.

### COMMON LAW UNFAIR COMPETITION

■ New York law governs on the unfair competition claim. Flexitized, Inc. v. National Flexitized Corp., 335 F.2d 774 (2d Cir. 1964), cert. denied, 380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799 (1965).[12] The law of trademarks is part of the larger body of the law of unfair competition, and in order to succeed on a claim of unfair competition, plaintiffs must establish, as they were required to do under the Lanham Act claim, that there is a likelihood of confusion as to the origin of defendant's driving instruction. Avon Shoe Co. v. David Crystal Inc., *supra*; Field Enterprises Educational Corp. v. Grosset & Dunlap, Inc., *supra*; Dell Pub. Co. v. Stanley Pub. Inc., 9 N.Y.2d 126, 211 N.Y.S.2d 393, 172 N.E.2d 656 (1961). In view of the court's finding that there is no such likelihood of confusion, the common law claim must also fail.

### NEW YORK'S ANTI-DILUTION STATUTE

■ Although the language of the statute[13] appears to dispose of the necessity of establishing confusion, the cases require that either a likelihood of confusion be found, or a finding that the defendant intentionally selected the name with the intent to trade upon the reputation of the prior user. National Color Lab., Inc. v. Philip's Foto Co., 273 F. Supp. 1002 (S.D.N.Y.1967); Haviland & Co. v. Johann Haviland China Corp., 269 F.Supp. 928 (S.D.N.Y.1967); Field Enterprises Educational Corp. v. Grosset & Dunlap, Inc., *supra*; Polaroid Corp. v. Polarad Electronics Corp., 182 F.Supp. 350 (E.D.N.Y.1960), aff'd, 287 F.2d 492 (2d Cir.), cert. denied, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961); Cue Pub. Co. v. Colgate-Palmolive Co., 45 Misc.2d 161, 256 N.Y.S.2d 239, aff'd, 23 A.D.2d 829, 259 N.Y.S.2d 377 (1965).[14] See Dole, Merchant and Consumer Protection: The New York Approach to the Regulation of Deceptive Trade Practices, 53 Cornell L.Rev. 749, 768–69 (1968). In view of the court's negative findings as to both these elements, the statutory claim under § 368–d of the New York General Business Law must also fail.

The foregoing shall constitute the court's findings of fact and conclusions of law. The Clerk is directed to enter judgment for the defendant.

---

12. Prior to *Flexitized*, the Second Circuit had noted often that there are no real differences between federal and New York decisions. See, *e.g.*, Safeway Stores, Inc. v. Safeway Properties, Inc., *supra*; Maternally Yours, Inc. v. Your Maternity Shop, *supra*.

13. See *supra* note 3.

14. The Court of Appeals for this Circuit has never expressly considered this question. Most recently it left it open in Gold Master Corp. v. Miller, 380 F.2d 128 (2d Cir. 1967).

**20**

H—1: 1

SPECIAL SUFFOLK COUNTY STUDY FROM SPECIAL SAMPLE          DOC.#: 2–3–4–5

1. This is Mrs. _____.  I am calling you long distance from suburban Philadelphia. My company is conducting a survey—I am not selling or soliciting.  IF SPEAKING WITH FEMALE, ASK:  May I speak with any male member of your household who is 18 years or older for a few minutes, please?

   IF MALE NOT AVAILABLE TODAY OR TOMORROW, SPEAK WITH THE FEMALE.  RECORD TIME FOR MALE CALL-BACK ON CARD.

2. In six months from now—that is, by next (NAME MONTH THAT SIX MONTHS WILL BE)—do you expect local business conditions in Suffolk County to be better than they are now, worse, or about the same as now?                                        H—6

   BETTER (  )$^1$   WORSE (  )$^2$   SAME (  )$^3$   DON'T KNOW (  )$^4$   OTHER (FILL): ..5

3. As far as employment is concerned in Suffolk County, in six months from now—do you think there will be more jobs, fewer jobs or about the same as now?                    H—7

   MORE (  )$^1$   FEWER (  )$^2$   SAME (  )$^3$   DON'T KNOW (  )$^4$   OTHER (FILL): ....5

4. What does the name Westinghouse mean to you?

   FILL: ..........................................................................H—8—9

5. What does the name Chesterfield mean to you?

   FILL: ..........................................................................H—10—11

6. What does the name Coldspot mean to you?

   FILL: ..........................................................................H—12—13
   IF DO NOT NAME SEARS OR SEARS & ROEBUCK, ASK:  Where would you go to buy a Coldspot product?

   FILL: ............................................................H—14—15

7. What does the name Yale mean to you?

   FILL: ..........................................................................H—16—17

8. What does the name Firestone mean to you?

   FILL: ..........................................................................H—18—19

9. Have you ever bought any Firestone products?                               H—20
                                        YES (  )$^1$ NO (  )$^2$ DON'T KNOW (  )$^3$
   IF YES, ASK:  What Firestone product did you buy and where did you buy it?   H—21
                                                                             H—22
   FILL PRODUCT BOUGHT: ...................................
                                                                             H—23
   FILL WHERE BOUGHT: ....................................                     H—24

10. What does the name Allstate mean to you?

    FILL: ..........................................................................H—25—26

11. Have you ever bought any Allstate products?
                                        YES (  )$^1$   NO (  )$^2$            H—27
    IF YES, ASK:  What Allstate product did you buy and where did you buy it?
    FILL PRODUCT BOUGHT: ..............................................H—28
                         ..............................................H—29
    FILL WHERE BOUGHT: ................................................H—30
                         ..............................................H—31

12. Do you recall seeing the name Allstate mentioned recently in any advertisements anywhere?
    YES ( )¹ NO ( )²                                                      H—32

    IF YES, ASK: a) What do you recall being advertised?                  H—33

                 FILL: ...........................................H—34

              b) Anything else? FILL: ..............................H—35

---

13. Are you familiar with the fact that if a person wants to learn how to drive an automobile there is a driving school where people can go to learn how to drive?
    YES ( )¹ NO ( )²                                                      H—36

---

14. a) Can you name any driving schools that are located within the Suffolk County area?
       YES ( )¹ NO ( )²                                                   H—37

    IF NO, SKIP TO QUESTION 15.
    IF YES, ASK: Will you please name these driving schools?
    FILL: ...........................................................H—38

    b) Any others? FILL: ...............................................H—39

    c) Any others? FILL: ...............................................H—40

    IF NAME ALLSTATE, SKIP TO QUESTION 15.

    IF DO NOT NAME ALLSTATE, ASK: Have you ever heard of the Allstate Driving School?
       YES ( )¹ NO ( )²                                                   H—41

    IF NO, SKIP TO QUESTION 16.
    IF YES, CONTINUE WITH QUESTION 15.

---

15. a) Do you know where the Allstate Driving School is located?
       YES ( )¹ NO ( )² H—42

    IF YES, ASK: Where? FILL: .....:...................................H—43
    b) Who do you think owns or operates the Allstate Driving School?

    FILL: ...........................................................H—44

---

16. Have you, yourself, ever taken automobile driving lessons?
    YES ( )¹ NO ( )² H—45

---

17. Do you know of anyone else who has ever taken automobile driving lessons?
    YES ( )¹ NO ( )²                                                      H—46

    IF YES, ASK: Who?
              FILL: ..............................................H—47
                    ..............................................H—48

---

18. a) If the Allstate driving school had been highly recommended to you—and, you wanted to take automobile driving lessons or to send someone else to take driving lessons—how would you go about contacting the Allstate Driving School?

    FILL: ...........................................................H—49
    .................................................................
    b) Any other way?

    FILL: ...........................................................H—50

---

19. In your opinion—who owns or operates the Allstate Driving School?
    FILL: ...........................................................H—51

---

20. You have been most helpful—in order to classify this interview with thousands of others just like it—I have a few background questions to ask—I might add that all information you give me immediately loses it identity—are you married, single or other?
    M ( )¹ S ( )² DIV ( )³ SEP ( )⁴ WID ( )⁵ REF ( )⁶      H—52

21. a) At what type of work are you, yourself, presently employed? WE WANT OCCUPATION—NOT WHERE EMPLOYED.
       FILL: .....................................H–53–54
    b) How many years of schooling have you completed? FILL: .................H–55–56
    c) And, your approximate age? FILL: ...................................H–57–58

---

22. How long have you lived in this Suffolk County area?
    FILL: ..............:.....................H–59–60

---

23. And, one last question—in which of the following income brackets does the total combined annual income of your household fall—stop me when I get to the right one . . .

    1) Under 4000? ( )
    2) 4000 up to but not including five? ( )
    3) 5000 up to but not including seventy-five? ( )
    4) 7500 up to but not including ten? ( )
    5) 10,000 up to but not including 12,500? ( )
    6) 12,500 up to but not including 15,000? ( )                    H–61
    7) 15,000 and over? ( )
    8) Don't know ( )
    9) Refused ( )

    IF DON'T KNOW OR REFUSED, ASK: Would you say your income is more than or less than $10,000 a year?
                    MORE ( )[1]   LESS ( )[2]

---

SEX OF RESPONDENT:   MALE ( )[1]   FEMALE ( )[2]        H–62

ENTER DATE MADE: ................................

TELEPHONE NUMBER OF COMPLETED INTERVIEW: ..........................

INTERVIEWER'S NAME: ...............................................